Merchants National Bank of Aurora, as Administrator of the Estate of Harold E. Seckman, Deceased, Plaintiff-Appellee, v. The Elgin, Joliet & Eastern Railway Company, an Illinois Corporation, Defendant-Appellant, and Edward L. Sak, Jr., Administrator of the Estate of Marilyn J. Sak, Deceased, Defendant-Appellant.

Gen. No. 69–105.

Second District.

March 23, 1970.

Rehearing denied and opinion modified April 24, 1970.

446

Hackbert, Rooks, Pitts, Fullagar and Poust, of Chicago, and Alschuler, Putnam, McWethy, Weiss & Weiler, of Aurora, for appellants.

Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

The plaintiff, as Administrator of the Estate of Harold E. Seckman, Deceased, sued the defendant, E. J. & E. Railway Company, and the Administrator of the Estate of Marilyn J. Sak, Deceased, the driver of the vehicle in which Seckman was riding, to recover damages resulting from a crossing accident. The jury found against both the railroad and the administrator of the host driver and awarded damages of $250,000 to plaintiff.

Only the railroad appeals from the judgment entered on the verdict, claiming that it was not negligent in the operation of its Train No. 6, that the sole proximate cause of the collision was the negligence of the driver of the vehicle, and that it was prejudicial error to permit an expert to testify to the alleged inadequate protection at the crossing. Reversible error is also claimed in the instructing of the jury.

The collision between a southbound freight train and a westbound pickup truck with a mounted "camper" occurred on October 30th, 1967, about 5:30 p. m. at the 143rd Street crossing of the railroad, one mile north of Plainfield, Illinois. The issue of defendant's negligence was submitted to the jury with the particular allegations charging failure to install adequate visual, physical and audible warning devices at the 143rd Street crossing, operation of the train at excessive speed, failure to apply the brakes, failure to keep a proper lookout and failure to blow a whistle through the crossing.

448

Inasmuch as the defendant claims error in the refusal to direct a verdict, the parties concede that the case is to be approached under the Pedrick rule (37 Ill 2d 494, 510, 229 NE2d 504 (1967)) in the aspect of the evidence most favorable to the plaintiff. We summarize the evidence in convenient headings with this in view.

*Evidence of the physical aspects of the crossing.*

143rd Street is a two-lane blacktopped county highway running easterly and westerly. It intersects the main line of the railroad at slightly more than a right angle on the approach to the tracks from the east going west. The speed limit on 143rd Street in the area in question is 65 miles per hour. It is flat for some 900 feet east of the crossing.

The railroad tracks are straight, and run generally north and south. On the easterly approach to the crossing, there is a county highway sign on the north side of the road approximately 900 feet east of the crossing, marked with a black "X" and "RR"; the pavement east of the crossing has a painted warning. The crossbucks are aluminum, covered with a retroflecting material. There was testimony that such material, when new, reflects light 180 times better than white paint; that because of the age of the application about 86% of the original reflection was still retained; and that dirt would reduce the reflection to an undetermined degree.

There were no gates or flashers.

*Evidence related to visibility.*

The weather was described variously as raining, drizzling, a little foggy, and misty.

There were no streetlights focused on the crossing. Visibility at the crossing was described by various witnesses as dark due to the heavy overcast and approach-

449

ing sunset, halfway between bad and good, fairly poor, hazy, and almost dark.

Factory buildings in the area were lighted from the outside and in the parking areas, and there was testimony that the crossing itself, with no lights, appears to get darker than it would when the lighting was material and constant. Lights of trains would be horizontally aligned with building lights.

There was testimony of a survey of sight distances made on February 5, 1968, offered by the railroad, to the effect that if a vehicle was some 700 feet east of the railroad crossing on 143rd Street there would be an unobstructed view to 452 feet north of the crossing along the tracks, increasing to 798 feet when the vehicle would approach to 200 feet east of the crossing. The testimony purported to take account of the buildings in the area and certain boxcars which were on a factory siding 600 feet north of the crossing as indicated on the date of the accident. On cross-examination, the witness who testified as to the survey conceded that the visibility distance would apply at night "unless there was an obstruction like fog between the vehicle and the train." The sight line distances were computed in back and in front of the boxcars on the siding.

Aerial photographs of the area were admitted with the location of buildings, the positions of the vehicle and of the train, and boxcars on sidings indicated. Photographs of the area and buildings were introduced which had been taken both in the daytime and at night.

There was testimony that the crossing signs reflected well with the bright lights of an approaching vehicle, but with normal lights, "they were just a little low although you could see it."

In furtherance of its theory that there were distracting conditions affecting visibility as well as the physical sight distances, plaintiff presented testimony that there was a cut switch train of 8 cars to the south of

450

the crossing; and that on the siding some 1,000–1,680 (depending on conflicting testimony) feet north of the crossing, in the same direction as defendant's Train No. 6 was approaching, there was a working switch train with headlights, gyrolight, whistle and 8 cars, which a part of the conflicting testimony indicated would have been visible to the Seckman vehicle; and that on a siding for the Fleischmann factory, which building was located about 384 feet east of the crossing, there were 3 parked boxcars.

*Evidence related to the "camper" and its occupants.*

Marilyn J. Sak was the driver of the camper on this day under a car-pool arrangement. 143rd Street route had been taken for several weeks prior to the accident, but this was a temporary measure due to construction work on the route usually taken. There was testimony as to her careful habits.

There was testimony of Seckman's careful habits, additionally, with further evidence that he had a perforated right eardrum which affected hearing in that ear.

Plant guards at the Fleischmann factory, stationed at a guardhouse some 528 feet east of the crossing, testified that they watched the taillights of the camper all the way to the crossing, that no brake lights went on, and that the camper never changed speed or swerved. They described the camper as being 459 to 560 feet east of the crossing when they first saw it, traveling at 35 to 60 miles per hour.

The engineer of Train No. 6 was on the right side of the cab and did not see the camper prior to the impact; however, the head brakeman, on the left side of the engine cab, testified that he first saw the camper when it was about 500 feet east of the crossing and at a time when the locomotive was about 250 feet north of the crossing. The camper was then going between

451

50 and 60 miles per hour and had its headlights on. At no time did the camper appear to slow, speed up, or swerve.

Other railroad employees in the area also testified that the camper did not increase or decrease its speed prior to the impact.

The witnesses observing the incident testified to an interval of 3 to 5 to 8 seconds from observation of the camper to time of impact.

*Evidence related to the operation of Train No. 6.*

The engineer testified that he put on the bell, which is an automatic device, at the whistling post for Van Dyke Road, a point located 1,320 feet north of Van Dyke Road. He stated that the bell rang from that point until he stopped 25 car lengths past the accident. He blew the whistle for VanDyke Road and was blowing the whistle for 143rd Street when the head brakeman told him that a truck was approaching from the left. Just prior to the impact the brakeman said "Oh," and the engineer then put the train into emergency. He was not sure if he caused the emergency action or if it was the impact itself, which cut the brake line.

Both headlights on the locomotive were on bright and the red gyrolight located on top of the cab was on and working. The engineer had made a brake application at the whistling post for VanDyke Road and the train started to slow down at that point from its speed of 45 miles per hour, as he was entering a speed restriction zone. He estimated the speed of the train at 25 miles per hour at the time of the collision. There were 88 cars comprising Train No. 6, in addition to the locomotive and caboose.

The head brakeman testified that he first saw the camper 10 railroad car lengths, or 500 feet, east of the crossing. At this time, the locomotive was 5 railroad car lengths, or 250 feet, north of the crossing. The

452

engineer was blowing the whistle. The bell was ringing, the two headlights were on and the other lights on the engine were on, including the red gyrolight on top of the cab. The emergency brake was applied at the instant of impact. This witness also testified to the emergency ring which he would have pulled if he knew the truck wasn't going to stop, but he could not say if that would have stopped the train before reaching the crossing. This witness also testified that the train was going about 25 miles per hour and was in the process of braking at the time of the collision.

The head brakeman of the switch crew was standing near what has been described as the Kerr plant lead, about 1,680 feet north of the 143rd Street crossing when the accident happened. He said he saw the headlight of Train No. 6 first and then could hear the whistle for the VanDyke crossing and testified that it whistled all the way across 143rd Street.

The conductor of the switch train testified that he was some 1,400 feet north of 143rd Street at the time of the accident, and that Train No. 6 passed him at 25 to 30 miles per hour, with its headlights, number lights and gyrolights on. He heard it whistle for Van Dyke Road and for 143rd Street. The rest of the crew of Train No. 6 testified similarly.

The guards at the Fleischmann plant testified that the train's headlights were on, but that they did not remember seeing the revolving red mars light until after the accident, and that the train did not slow before the impact. One of the guards said that he did not remember hearing the whistle at any time after the train reached a point 275 feet north of the crossing.

*Evidence related to crossing standards.*

An engineer with the State of Illinois Division of Highways testified that the Department of Public Works promulgates standards which were in effect specifically

453

for the 143rd Street crossing on October 30th, 1967. The standards were introduced as an exhibit. The witness also testified that the fair and reasonable cost of installing flashers and gates at the 143rd Street crossing in 1967 was approximately $15,000.

He also testified to traffic counts taken on all of the state system from which the State Bureau of Research planning predicts future traffic on a normal rule of thumb figure of 4% per year increase in this area, assuming no rapid growth.

There was evidence that 10 trains a day passed the crossing. A witness testified to vehicular traffic of 500 to 800 vehicles daily at the crossing.

*Expert testimony relating to the extrahazardous nature of the crossing.*

J. Carl McMonagle, a professor at Michigan State University in the transportation planning department, testified for the plaintiff over objection. His qualifications were not disputed and included a degree as a civil engineer and experience in the Michigan State Highway Department for 21 years, with a background in the study, practice, and theoretical aspects of grade crossing protection, with 25% of his time spent in the study and evaluation of grade crossing problems. He was a past national president of the Institute for Traffic Engineers.

He concluded, in answer to a hypothetical question, that the crossing was "very inadequately protected," and that a minimum adequate protection at this crossing would be flashing lights and bells.

Preliminarily to answering the hypothetical question, he testified that he had made both daytime and nighttime inspections of the crossing, and had examined the various plats and photographs in evidence showing the character of the area surrounding the crossing. He referred to the effect that the nighttime lighting had

454

on the crossing, stating that the unlighted crossing appears to get darker around the particular area by reason of the lighting in the nearby plant area. He characterized this as a "recognized physiological phenomena," and related to many past studies. He considered the custom and practice in Illinois with respect to various warning signs, and he considered standards promulgated by the Illinois State Highway Department for grade crossing protection. This was in relation to the number of trains daily, their average speeds, the average speeds of automobile traffic, the average daily volume of automobile traffic and the type of the highway.

Defendant railroad, in its argument that it was not shown to be negligent within the issues submitted under the pleadings to the jury, urges that the evidence shows that the statutory warning was given, that there were no special conditions at the crossing requiring additional protection or warnings, that there was no evidence that the train was operating at excessive speed, no evidence that it failed to keep a proper lookout, and no evidence that it was negligent in attempting to stop.

Railroad crossings are, of course, inherently dangerous, and not every circumstance which might be said to increase the degree of danger will impose a duty upon the railroad to provide extraordinary means to protect the crossing beyond signs warning of its presence.

■ Whether the railroad had the duty here to, at the least, erect a warning device which would add the dimension of sound and which would increase the visibility of the warning by flashing lights, depends upon a number of interacting factors, all directed at the question of what precautions would enable a traveler to ascertain the approach of a train.

Because the existence of the duty and the acts which may be considered to breach the duty, as well as the causative factors, must necessarily vary in the circum-

stances of each case, the authority of precedent cases is greatly limited, except as they furnish general principles.

 The amount of protection required is dependent upon the circumstances existing at the particular crossing, at the particular time of the approach of the vehicle. These factors include population and traffic in the area, physical obstructions to view, and the effect which confusion incident to railroad or other business in the area would have on the sight or hearing of ordinary signals. Applegate v. Chicago & N. W. Ry. Co., 334 Ill App 141, 152, 78 NE2d 793 (1948). See also Grand Trunk Ry. Co. of Canada v. Ives, 144 US 408, 36 L Ed 485, 12 S Ct 679 (1891); and see 5 ALR2d 112, Annotated. The fact that a statute may provide one precaution does not relieve the railroad from adopting such others as public safety or common prudence may dictate. Wagner v. Toledo, P. & W. R. R., 352 Ill 85, 91, 185 NE 236 (1933). That the Illinois Commerce Commission has not ordered a certain warning or signaling device at the crossing does not thereby relieve a railroad of negligence in not providing such device. Willett v. Baltimore & O. S. W. R. Co., 284 Ill App 307, 312, 1 NE2d 748 (1936).

Analysis of the interacting facts present in this record viewed in aspect most favorable to plaintiff, in our view, supports the jury verdict.

We cannot agree with defendant's statement that the crossing was a "simple country crossing and properly marked," as a matter of law. There were factory buildings in the area, with consequent increase in activities and traffic. While the area of the crossing was not obstructed so as to prevent an adequate and reasonable view of approaching trains under all conditions, there was evidence of special conditions existent at the time of the approach of the vehicle.

The jury could have properly determined from the conflicting evidence that at the particular time of the accident, the crossing was dark and visibility of both the crossing and the crossbucks and other painted warning signs was diminished by weather conditions which the jury could have selected from descriptions ranging from degrees of fog, rain and mist. They could also have determined from the conflicting evidence that the retroflecting material on the crossbucks afforded diminished warning because of age and exposure and the lesser retroflection from the beam of normal driving lights from an approaching vehicle. Under the circumstances, the jury, having before it various photographs and plats, could best assess the ability of a driver to see both warning signs and the approach of the train, and could properly have assessed the evidence of sighting distances presented by the railroad survey and witness, particularly when this evidence was not qualified to the particular conditions which could be found to be operative at the time of the accident. The jury was also in a superior position to assess the testimony as to the effect which the lighting of the buildings and parking lights could have in restricting visibility of the danger at the crossing in the movement of the vehicles from a light area into a darker one. Similarly, the jury could assess whether the operation of the switch train and the placement of boxcars on sidings in the area, made for conditions which were not ordinary and which might be considered to have an effect on the hearing or the seeing of ordinary signals.

While the defendant railroad has cited numerous cases in which particular individual factors claimed by plaintiff to be present here, were held not to be controlling in determining whether a crossing was extrahazardous, these are of little help in deciding whether the interacting combination of evidentiary factors in this case sufficiently define an issue of negligence for the jury.

457

While defendant suggests that Haley v. Baltimore & O. R. Co., 341 F2d 732 (7 Cir–1965), "contains almost identical facts" to those in the present case, we do not find this to be so. Among the distinguishing facts of the cases are that the factory near the crossing in the cited case was not in operation and the minimal stationary lights on the factory grounds are not comparable to the lighting situation shown here. The motor vehicle in that case had no lights on, so that the train crew could not be chargeable with knowledge of its presence. There was no evidence of rain, mist or fog. There was no evidence of switching activity. Haley was the plaintiff driver and not a guest as is the plaintiff decedent here, and the driver's contributory negligence appears to have been a substantial factor in the holding.

Defendant suggests also that Shaw v. Chicago & E. I. R. Co., 332 Ill App 285, 75 NE2d 51 (1947) presents a similar situation. Among other distinguishing facts, there was no allegation in that case of the ultrahazardous nature of the crossing and, again, the contributory negligence of the driver, or an intervening cause under the driver's control, weighed materially in the ruling.

■ We conclude that whether the crossing here was extrahazardous was properly a jury question.

■ In this perspective, the issue of whether Train No. 6 was traveling at excessive speed, and whether a proper lookout and emergency stopping procedures were maintained, became jury questions, considering the totality of the evidence of alleged negligence viewed in the aspect most favorable to the plaintiff.

■ Henegar v. Illinois Cent. R. Co., 30 Ill App2d 418, 174 NE2d 887 (1961) (abst), is cited by defendant apparently for the proposition that a train speed of 50 miles per hour or less (here the evidence ranged between 20–40 miles per hour) is no evidence of negli-

gence, as a matter of law. This is not the holding. Under the particular circumstances of that case, the train traveled "over open country within view of all, even in adverse weather," and under those circumstances the operation of the train could not be considered negligent or a causative factor in the collision. Speed is not negligence per se, but may become an act of negligence under particular circumstances. See Applegate v. Chicago & N. W. Ry. Co., supra, at page 150; and Zank v. Chicago, R. I. & P. R. Co., 26 Ill App2d 389, 168 NE2d 473 (1960) (abst), and Longhini v. Gulf, M. & O. R. Co., 348 F2d (CA 7th, 1965).

██ Defendant also urges that there was no evidence of improper lookout to submit to the jury, relying principally on Robertson v. New York Cent. R. Co., 388 Ill 580, 58 NE2d 527 (1945). In Robertson, the issue was whether the railroad was willful and wanton rather than merely negligent. There was no evidence that the motor vehicle would not stop at the crossing. Here, the train fireman and lookout saw the "camper" when it was 500 feet east of the crossing, going between 50–60 miles per hour, in his opinion, and he said that he did not conclude it was not going to stop until it was right in front of the train. The fireman's warning to the engineer, "there is a truck coming," under the circumstances, was a recognition that the camper was not stopping, and the inaction and failure to institute emergency procedures after a lack of response by the engineer was some evidence of negligence for the jury to consider.

██ We would not agree with the defendant that there was no evidence that the statute which requires a whistle or a bell to be rung or sounded up to the crossing from a point at least 80 rods (1,320 feet) was violated. (Ill Rev Stats 1967, c 114, § 59.) The ringing of the bell was testified to as an automatic device.

459

The testimony of one of the guards at the Fleischmann plant that after the first blast of the train horn, which called its approach to his attention, he could not "recall hearing it again," is negative testimony and contrary to the testimony of all of the railroad witnesses that the horn sounded continuously in the long, short blasts prescribed. Such negative testimony can have probative value only where the witness was in such proximity that he could have heard the sound had it been given and his attitude of attention was such that if sounded it would have attracted his attention. Applegate v. Chicago & N. W. Ry. Co., supra, at page 149; Berg v. New York Cent. R. Co., 391 Ill 52, 60, 61, 62 NE2d 676 (1945). The testimony here may be said to have some probative value so that it was not error to submit the issue to the jury. However, we perceive that it may have been given little weight in the jury's determination and was not necessary to support the verdict.

■ From what we have said, it follows that the negligence of the driver of the camper was not the sole proximate cause of the collision, and it was not error for the trial court to so rule, leaving the question of whether there was concurring negligence on the part of the driver and the defendant railroad company to the jury.

■ Permitting the expert witness to give an opinion that the crossing was inadequately protected was a ruling within the court's sound discretion, and was not error.

Defendant argues that the case of Hughes v. Wabash R. Co., 342 Ill App 159, 95 NE2d 735 (1950), which reversed a judgment when an expert witness characterized a railroad crossing as extrahazardous, survives in its result although not in all of the reasoning used. It is defendant's claim that the later cases which have

reexamined and liberalized the offering of opinion evidence over the objection that such evidence usurps the jury's function of drawing the necessary inferences from the circumstances, or invades the jury's province of determining the ultimate issue, still require a preliminary showing of the *necessity* to assist the jury in drawing inferences from facts before a witness may be allowed to testify in the general area of inquiry. Miller v. Pillsbury Co., 33 Ill2d 514, 211 NE2d 733 (1965) is thus cited for the rule that expert testimony must be "necessary" and "essential" before it is admissible. Abramson v. Levinson, 112 Ill App2d 42, 250 NE2d 796 (1969), is similarly cited.

Both of the cited cases involve the use of so-called "reconstruction experts," and we do not believe that the rule applicable to that kind of testimony may be applied, chapter and verse, to opinion evidence whether a combination of factors makes a locale hazardous or extrahazardous. The Supreme Court in Miller v. Pillsbury, supra (at page 516), recognized the general trend of permitting expert testimony "even as to matters of common knowledge and understanding where difficult of comprehension and explanation." The Appellate Court in Baran v. City of Chicago Heights, 99 Ill App2d 221, 227, 240 NE2d 381 (1968) approved the trial court's discretion in allowing an illumination expert to give an opinion, based upon engineering society standards, his training and education, and his examination of the area, that an intersection was improperly lighted. While as defendant argues, it does not appear that the question of admissibility was directly raised either in the Appellate Court, or in the Supreme Court, the latter court affirmed and noted without further comment, that "plaintiff called as an expert an electrical engineer who testified that in his opinion the intersection was improp-

erly illuminated, that the light pole was placed on the wrong corner." Baran v. City of Chicago Heights, 43 Ill2d 177, 180, 251 NE2d 227 (1969).

Cases from other jurisdictions which involved a specific question of expert opinion as to the hazardous nature of a railroad crossing are not in agreement. We believe the better reasoning delineates a trend toward permitting such testimony in the sound discretion of the court when the witness has a peculiar knowledge or experience not common to the world in general which may aid the finder of fact in determining the issues before it. The court or jury is, of course, not bound to accept the conclusions of the expert. See Shutka v. Pennsylvania R. Co., 74 NJ Super 381, 181 A2d 400, 409 (1962); Southern Pacific Co. v. Watkins, 83 Nev 471, 435 P2d 498, 508 (1967); Bridger v. Union Ry. Co., 355 F2d 382, 387 (CA 6th, 1966).

 The interaction of lighting conditions, retroflection, traffic and weather factors, relative speeds of trains and vehicles, and distraction elements are of sufficient difficulty of comprehension and explanation to justify the assistance of expert testimony. Even if such testimony is not *necessary* and *essential* in an absolute sense, this seems clearly to be an area in which the finder of fact may, in fact, be *in need* of some assistance to make meaningful inferences in the particular circumstances of a particular case. We believe this to be a case in which the judge's discretion was properly exercised to admit the expert testimony.

Defendant next claims error in the giving of an instruction based upon Ill Rev Stats 1967, c 114, § 62:

" 'There was in force in the State of Illinois at the time of the occurrence in question certain statutes which provided:

462

" ' . . .

" 'Hereafter, at all of the railroad crossings of highways and streets in this state, the several railroad corporations in this state shall construct and maintain said crossings, and the approaches thereto, within their respective rights of way, so that at all times they shall be reasonably safe as to persons and property.

" 'If you find that the defendant violated the statutes on the occasion in question, then you may consider that fact together with all of the other facts and circumstances in evidence in determining whether or not the defendant was negligent immediately before and at the time of the occurrence.' "

Defendant urges that the statute is concerned with the physical layout and composition of a crossing and its approaches and does not relate to the issue of inadequate warnings.

 We agree that this was the apparent purpose of the statute and that it was not intended to broadly cover all issues related to warnings of extrahazardous crossings. Cleveland C., C. & St. L. Ry. Co. v. Moss, 89 Ill App 1, 6 (1899). The statute and similar statutes found in other jurisdictions seem always to have been directed against defective surface conditions at crossings and approaches. See 91 ALR2d 10, Annotated. Here there was no evidence of any physical defect in the surface layout or composition of the crossing and it was error to give the instruction. However, we do not find the error to be one which would so confuse the jury as to warrant a reversal. The jury was otherwise properly instructed as to the railroad's duty to maintain a safe crossing and the narrow inapplicability of the specific statutory section, in our view, could not change the result.

■ ■ We also find no error in the admission of plaintiff's exhibit No. 29, being "standards for grade crossing protection in the State of Illinois." It was shown that the standards were published by the Illinois Department of Public Works and were in effect on October 30th, 1967, including the particular location involved. Professor McMonagle confirmed that these were standards which were typical of "a good many states." Of course, such codes or standards do not have the force of law and may not be admitted as absolute evidence of standards of care. They serve much the same function as does evidence of custom and may be admitted when they aid the jury in deciding "what was feasible and what the defendant knew or should have known," as appropriately stated in Darling v. Charleston Community Memorial Hospital, 33 Ill2d 326, 332, 211 NE2d 253 (1965). Defendant cannot properly claim that since the Illinois Commerce Commission has not directly ordered more than crossbars at a particular crossing that all evidence which bears on common law negligence is barred. The citation of Clements v. Schless Const. Co., Inc., 91 Ill App2d 19, 26, 234 NE2d 578 (1968) in this respect is not appropriate. There the Structural Work Act as well as the Health and Safety Rules of the Industrial Commission controlled and measured the entire duty of the defendant; here the duty of a railroad to maintain safe crossings is broader than any particular statutory requirement. See Willett v. Baltimore & O. S. W. R. Co., supra.

The standards presented a formula for determining public safety based upon an "exposure factor" which is the product of anticipated total 24-hour vehicular traffic 10 years hence, and the current total 24-hour railroad traffic; and considered that

"Grade crossings are considered adequately protected by crossbuck signs until the 'exposure fac-

tor' reaches a level of 3,000 with at least 2 train movements daily. When this exposure level is exceeded, further protection by means of either flashing light signals or flashing light signals supplemented with gates is warranted. . . ."

Professor McMonagle testified to the customary application of the exposure factor in the field of traffic safety and concluded that "it works." The application of the factors in the hypothetical case exceeded the figure 5,000 with 3,000 being the maximum at which cross-bucks would be considered adequate.

The standards were only one of the factors considered by the expert witness and were properly a basis, in part, of his expert opinion.

The judgment below is affirmed.

Affirmed.

DAVIS, P. J. and MORAN, J., concur.