Richard J. WIEDENFELD, as Administrator of the Estate of Marcia Wiedenfeld, Deceased, et al., Appellants,

v.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Successor in Interest to Chicago and Northwestern Railway Company, and Alfred J. Coleman, Appellees.

Margaret A. LENNON, as Administrator of the Estate of Gregory Francis Lennon, Deceased, and Margaret A. Lennon, Appellants,

v.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Successor in Interest to Chicago and Northwestern Railway Company, and Alfred J. Coleman, Appellees.

No. 2–57216.

Supreme Court of Iowa.

April 20, 1977.

Jerry C. Estes, of Kersten, Opheim, Carlson & Estes, Fort Dodge, for appellants.

C. W. Garberson and Ralph W. Gearhart, of Shuttleworth & Ingersoll, Cedar Rapids, and John H. Mitchell, of Mitchell, Mitchell, Murray & Blackburn, Fort Dodge, for appellees.

Heard by REYNOLDSON, Acting C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

REYNOLDSON, Acting Chief Justice.

Plaintiffs' decedents, Marcia Wiedenfeld and Gregory Francis Lennon, died following a collision between the auto in which they were passengers and a locomotive owned by defendant Chicago and North Western Transportation Company and operated by defendant engineer A. J. Coleman. Separate actions for damages, consolidated for trial, resulted in verdicts for defendants. We have consolidated these appeals and now reverse and remand for new trial.

The collision occurred about 10:40 p. m. on Friday, July 28, 1972. Plaintiffs' decedents, both 17, were riding in a 1964 Chevrolet car driven by 16-year-old Susan Johnson. This auto was proceeding westward on an east-west Webster County blacktop road about two miles from Fort Dodge. At the collision point defendant railroad's single track angled northeasterly across the blacktop at grade. The usual crossbuck signs were in place. There was corn growing in the field southeast of the crossing.

Earlier in the evening Susan borrowed her father's car and was driving several other girls, including Marcia, around Fort Dodge. They heard about a party for a boy entering the service and followed another auto to what was referred to in the record as the Dencklau shed. A "kegger" was in progress. Since the party was not in honor of the person the girls knew, they stayed only a brief time. There was testimony two of the girls, including Marcia, may have consumed beer. The uncontroverted evidence disclosed Susan consumed none. Gregory (who apparently drank some beer) and another boy asked and received permission from Susan to ride back to Fort Dodge with them.

About the same time the Johnson car left the Dencklau shed area, David Rial and Charles Habhab left on their motorcycles. All proceeded west on the blacktop toward the railroad crossing.

Rial testified he and Habhab were going about 45 m. p. h. on their cycles. He saw a light he thought was a farmyard light. When Rial discovered it was a train headlight, he sped up and signalled Habhab to do the same. They barely cleared the train. When he had passed over the tracks, he looked back and saw the car for the first time and concluded it was not going to make it across.

Susan testified she was driving 35–40 m. p. h. before impact. There was no radio or air conditioning in operation. Her window was rolled down and there was no commotion in the car prior to impact. She looked left and right and then ahead. She did not hear a train whistle nor did she see the train headlight except possibly just prior to impact. She testified, "I was just driving down the road, and I saw the train, and I braked it, and we hit." She was seriously injured in the collision. At trial she had no recollection of any motorcycles on the road.

Plaintiffs introduced testimony of the surviving car occupants, the motorcyclists and persons living near the crossing, none of whom heard a train whistle before it reached the crossing. Defendants introduced controverting evidence.

Defendants' evidence disclosed that the train, comprising 39 cars and two diesel locomotives, was traveling at 30 m. p. h. as it approached the crossing from the southwest. Three persons were in the cab of the lead locomotive: engineer A. J. Coleman,

fireman R. N. Attwooll, and brakeman Don Heddinger.

Heddinger testified the engineer began blowing the whistle for the crossing at or before the whistling post. He observed the vehicles when the train was about 1100 feet from the crossing and the vehicles were a half mile away; the motorcycles passed the auto; he became alarmed and stood up most of the 25 seconds it took to reach the crossing because they did not appear to be stopping. The train did not slow down. He testified he started blowing the back-up whistle, a horn on top of the diesel facing to the rear. About 50 feet from the crossing, the engineer placed the train in an emergency braking condition. The motorcycles cleared the train by a car length to 50 feet; the car thudded into the side of the locomotive. The locomotive stopped 12 to 15 [railroad] car lengths on the other side of the crossing.

Fireman Attwooll was sitting on the left side in the locomotive cab. He had an emergency brake valve control available. It was his duty to "correct any malfunctions, and on the lookout for any obstructions or anything that might show up in front of you, crossings, anything like that." The brake valve was on the left side for the purpose of using it at his discretion. He testified the engineer blew the whistle continuously from a private crossing south of the whistling post, which was 940 feet from the crossing. He saw the vehicles when they were a half mile east of the crossing and observed the motorcycles pull up and pass the auto about 300 feet from the crossing. He estimated all were going approximately 60 m. p. h. Attwooll testified Heddinger started blowing the back-up whistle at the whistling post. He thought the engineer first applied the brakes when the engine was 160 to 200 feet from the crossing. He testified, "I was standing up when we seen them cars; we stood, all of us stood up" at the whistle stop and continued to stand until the impact.

Conductor Bjelland was riding in a caboose positioned 16 cars from the back of the train. He also had an emergency brake valve available to stop the train but he neither heard nor saw anything unusual until the train went into emergency braking. He heard no whistle. He was riding in a steel caboose and there was accompanying train noise.

Engineer A. J. Coleman sat on the right hand side of the locomotive cab. He testified the train speed limit on this run was 35 m. p. h. He started operating the whistle just before the engine reached the whistling post "because I saw traffic coming." He never stood up. From where he sat in the engine, he could see the vehicle lights by looking over the top of the cornfield. During the 25 seconds he observed them, he was sure the motorcycles were at all times ahead of the car. At a point he variously estimated at three car lengths from the crossing, 100 feet past the whistling post, and halfway between the whistling post and the crossing, he throttled the train down about one-half and it passed the crossing at a little less than 30 m. p. h. When he moved the throttle there was still time to stop the train before it reached the crossing by application of brakes. He testified the bell was ringing for the private crossing and at all times thereafter.

Plaintiffs' evidence, expert and other, tended to show the corn would obscure the locomotive headlight (which was placed below the top of the diesel) from one seated in a car, creating a hazardous crossing. Defendants' evidence, both lay and expert, indicated the headlight would have been visible over the top of the corn and the crossing was not hazardous.

On this appeal, plaintiffs raised 12 issues for review, some of which we consider in the divisions which follow.

I. *Instruction relating to the railroad's liability.*

Plaintiffs' petitions alleged both the defendant railroad and defendant engineer were negligent in failing (a) to maintain an automatic signal at the crossing, (b) to sound a whistle and ring the bell, (c) to reduce speed of train as it approached the crossing, (d) to maintain a proper lookout,

and (e) to stop the train before it collided with the Johnson auto when the collision could have been avoided.

Trial court's instructions submitted specification (a) as against the railroad company only. But in instruction 18 the jury was told,

> "If the defendant engineer was not negligent in one or more of specifications B, C, D & E, there can be no recovery by the plaintiffs as against him or the defendant railroad company on these specifications, and your verdict should on these specifications be neither against the defendant engineer or the defendant railroad company on said specifications of negligence."

Plaintiffs took timely exceptions to this instruction:

> "Your honor, we would object to instruction No. 18 for the reason that the second and third paragraphs create an impression which would be erroneous, that if the engineer alone was not guilty of specifications (b), (c), (d), (e) * * * then there would be no liability for the railroad. This is not the law; the railroad can be guilty of negligence through the fireman, for example, or any other employees of said railroad, and the manner in which the instruction is written, it places emphasis on the fact that if the defendant engineer was not [sic] innocent in one or more of the specifications, there can be no recovery by the plaintiffs as against him or the defendant railroad company.

> "That is erroneously stated, and is an improper statement of law."

Plaintiffs argue they charged both the railroad and the engineer were negligent in these specific ways, there was evidence of negligence as to specifications (b) through (e) on the part of railroad employees other than the engineer, and thus the above instruction was in error.

Defendants assert plaintiffs' petitions failed to allege any other railroad employees committed any acts of negligence, plaintiffs alleged the train was operated by defendant Coleman, and therefore any problems resulting from instruction 18 stemmed from plaintiffs' own pleadings. Defendants further assert there was not sufficient evidence to generate a jury question regarding any negligence of the fireman and brakeman.

Of course, trial court has a duty to instruct with reasonable fullness on pleaded issues which have supportive evidence. However, a mere scintilla of evidence is insufficient to authorize an instruction on an issue allegedly arising out of that evidence. See *Hawkeye Security Ins. Co. v. Ford Motor Co.*, 199 N.W.2d 373, 383 (Iowa 1972).

In Iowa, as at common law, the master and servant may each and both be liable for a servant's tort committed in the course of employment. See *Graham v. Worthington*, 259 Iowa 845, 866–867, 146 N.W.2d 626, 640 (1966). The right of a damaged or injured third party to sue and hold the employer liable is, in effect, a direct or primary right. *Id.* The servant is not a necessary party to an action against the master. See *Plumb v. Minneapolis & St. Louis Railway Co.*, 249 Iowa 1187, 1199, 91 N.W.2d 380, 388 (1958); *Losito v. Kruse*, 136 Ohio 183, 187, 24 N.E.2d 705, 707 (1940); 57 C.J.S. Master & Servant § 613, at 384 (1948). It follows the fact that the brakeman and fireman were not named defendants does not mean the railroad cannot be held liable for their negligence, if any, in this case.

The issue then becomes whether the claimed negligent acts of other employees were pleaded issues which have supportive evidence under the rule of *Hawkeye Security*, supra.

The petitions plainly allege negligence by the defendant railroad in each of the specifications (a) through (e). Because a corporation can act only through its agents, these allegations necessarily include the conduct of all involved employees.

We turn briefly to the remaining issue, whether there was more than a scintilla of evidence of negligence on the part of the

employees other than the engineer. Although plaintiffs' petitions allege the engineer was operating the engine, it is clear the fireman and brakeman had duties with respect to the areas in which negligence was charged. All three employees were in the engine cab and had some obligations as to lookout. The brakeman had the back-up whistle available. According to his testimony he apparently had authority to operate it. Plaintiffs' evidence, however, raised an issue whether it was sounded. The fireman had an emergency brake valve for his own operation yet he never used it. The engineer testified, "He probably would have if I hadn't gone into emergency, he probably gone [sic] there himself." If the jury believed the brakeman that the engineer did not emergency brake until 50 feet from the crossing, they might have concluded the fireman was negligent in not braking sooner and that if he had the auto would have cleared the crossing. See *Atlantic Coast Line Railroad Co. v. Kines*, 276 Ala. 253, 160 So.2d 869 (1964); *Merchants Nat. Bank of Aurora v. Elgin, J. & E. Ry. Co.*, 121 Ill. App.2d 445, 459, 257 N.E.2d 216, 224 (1970), aff'd, 49 Ill.2d 118, 273 N.E.2d 809 (1971).

■ While the issue is close, we hold there was more than a mere scintilla of evidence relating to the negligence of the other employees. Instruction 18 was an erroneous statement of law in this instance and plaintiffs' objection preserved the error. We reverse on this issue. We consider the remaining issues relied on by plaintiffs only to the extent deemed helpful on retrial.

II. *Issues relating to other instructions.*

A. Plaintiffs argue trial court unduly emphasized evidence favorable to defendants by including the word "bright" in describing the train's headlight in instructions 1 and 26.

Instruction 1 is a statement of the issues in the case. It included defendants' assertion plaintiffs' decedents were contributorily negligent, "In failing to observe the bright headlight of the approaching train and to warn the driver of the automobile

* * *." Instruction 26 explains this specification of contributory negligence and also sets out defendants' claim these passengers failed "to observe the bright headlight of the approaching train."

Evidence offered by defendants disclosed the engine headlight switch had three positions, "off," "dim," and "bright," and at and before the collision the switch was in the "bright" position.

Plaintiffs had moved to strike the word "bright" from a similar allegation in defendants' answer. As we read the record, trial court had granted this motion, although at a later point the court was not sure what this ruling had been. Plaintiffs specifically objected to this word as used in the two instructions, pointing out the jury would take it to be the court's characterization of the intensity of the light and not the position of the switch.

Plaintiffs argue use of "bright" as an adjective describing "headlight" gave undue emphasis to a phase of the case favoring defendants, citing *Rosenau v. City of Estherville*, 199 N.W.2d 125, 132–133 (Iowa 1972), and *Andrews v. Struble*, 178 N.W.2d 391, 400 (Iowa 1970).

Defendants contend the word "bright" would necessarily be included somewhere in the instructions because the uncontroverted evidence was that the switch was in the "bright" position.

■ We need not conclude whether the language of these instructions constituted reversible error. We do hold that if comparable instructions upon retrial use the word "bright," the word should be used to describe the position of the switch and not the headlight.

B. Plaintiffs allege in other particulars the instructions placed undue emphasis on the auto driver's negligence and the passengers' contributory negligence.

These acts of alleged negligence are mentioned in several instructions because defendants affirmatively alleged a number of different acts of negligence committed by the driver and by plaintiffs' decedents.

Some of the arguments raised on appeal relating to these instructions were not submitted to trial court.

■ We do not reverse merely because the court could have regrouped some of the instructions or rephrased them. *Reeder v. Iowa State Highway Commission,* 166 N.W.2d 839, 844 (Iowa 1969); see *Dickman v. Truck Transport, Inc.,* 224 N.W.2d 459, 464 (Iowa 1974). Armed with the briefs in this appeal, trial court will be able to obviate some of these objections on retrial.

C. Instruction 21 related to the auto driver's alleged negligence, asserted by defendants to be the sole proximate cause of the collision. This instruction incorporated the requirement of § 321.341, The Code, that if the whistle was sounded and if the driver heard it or in the exercise of reasonable care should have heard it, she was required to bring the car "[to a] stop within fifty feet but not less than ten feet from the nearest track * * *."

On appeal, plaintiffs ask us to reconsider our decision in *Hoyt v. Chicago, Rock Island and Pacific Railroad,* 206 N.W.2d 115 (Iowa 1973). Neither the instruction nor the objections urged below impel us toward such reconsideration.

D. Plaintiffs pled failure to equip the locomotive with a "mars" or oscillating headlight was negligence, and requested an instruction thereon. They objected because such instruction was not included in those submitted to the jury. They argue the corn in the field between the approaching auto and train was seven or eight feet tall, and the locomotive headlight was only eight and one-half feet above the track. The engine was equipped with a socket about three feet above the headlight, designed to accommodate a mars or oscillating light. This type of light, they assert, could have been seen by car occupants (whose eye level was only about four feet above the roadway) over the top of the taller corn, and could not have been confused with farm security or other lights.

Defendants argue any issue concerning the engine headlight is resolved and pre-empted by federal regulations. 49 C.F.R. § 230.231(a) (requiring electric light sufficient to disclose object as large as a man standing upright at distance of 800 feet). They argue any additional requirements would be an undue burden on interstate commerce, citing *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). It is true that when § 477.22, The Code, formerly provided for greater illumination it was held inapplicable in view of the governing federal regulations. *Brown v. Chicago, R. I. & P. R. Co.,* 108 F.Supp. 164 (N.D.Iowa 1952).

■ We hold trial court did not err in not submitting to the jury the duty of a railroad to equip trains with oscillating headlights.

E. Three other issues raised by plaintiffs relate to submission and language of instructions relating to the passenger's alleged contributory negligence in failing to keep a proper lookout and failing to warn the driver.

Plaintiffs assert their decedents had no obligation to keep a lookout as there was no evidence they "undertook" to do so, citing *Scott v. Chicago, Rock Island & Pacific R. Co.,* 197 F.2d 259, 262 (8th Cir. 1952). Further, defendants had the burden to show these passengers were negligent in this particular, § 619.17, The Code, and in this instance failed to produce any evidence bearing on lookout or lack of lookout. See *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 650 (Iowa 1969). It was error, they therefore assert, to have submitted instructions relating to this specification of contributory negligence.

Defendants concede they had the burden of proof on this contributory negligence issue. They state *Scott,* supra, is not a correct statement of the Iowa law, which is more accurately set out in *Gant v. Chicago and Northwestern Railway Company,* 434 F.2d 1255, 1261 (8th Cir. 1970), where the court said, "The duty to be constantly on guard at a railroad crossing is not limited solely to the driver, but applies with equal force to the passenger." ·

Defendants assert there was sufficient evidence in the record—for example, the driver's testimony there was no commotion in the car just prior to the collision—to justify an inference the plaintiffs' decedents did not see or hear the train by reason of failure to maintain a proper lookout and consequently failed to warn the driver.

While there is a question whether plaintiffs preserved below the issues raised here, we do not believe either of the above federal decisions, as interpreted by the respective parties, correctly states the Iowa law.

There should be no greater lookout required of a passenger with respect to a railroad crossing than with respect to any other road danger. Our rules are expressed in *Ehlinger v. State,* 237 N.W.2d 784, 790 (Iowa 1976); *Glandon v. Fiala,* 261 Iowa 750, 755, 156 N.W.2d 327, 331 (1968); *Fry v. Smith,* 217 Iowa 1295, 1298, 253 N.W. 147, 149 (1934) (passenger asleep). They are in conformity with Prosser's statement of a passenger's obligation:

> "He is required to exercise reasonable care for his own safety, and will be barred from recovery if he voluntarily rides with a driver whom he knows to be intoxicated, reckless or incompetent, or unreasonably fails to warn the driver of a danger which he discovers, or to make use of any ability [which he may possess] to control the negligence * * *. In the ordinary case the question of the reasonableness of the passenger's conduct is for the jury; and it is now the prevailing view that he need not be on the alert or watch the road, and may trust himself to the driver until he has reason to believe that there is danger."

—Prosser on Torts § 74, at 489 (1971).

All of the jury instructions must be read and construed together, not piecemeal and in artificial isolation. *Madison Silos, Div. of Martin Marietta Corp. v. Wassom,* 215 N.W.2d 494, 501 (Iowa 1974). So viewed, we find trial court's instructions on lookout sufficiently incorporate the above law. We also find the record made upon the trial of this case justified submitting to the jury the issues of the passengers' lookout and failure to warn the driver. See rule 344(f)(10), Rules of Civil Procedure.

### III. *Issues relating to evidence.*

A. Plaintiffs assert trial court erroneously admitted an experimental sound recording of the train's whistle. They allege the differences between the condition under which the recordings were made and those at the time of the collision were "so substantial that the recording could only have misled and confused the jury."

These recordings were made months later at the same crossing using the same engine with the same railroad personnel attempting to blow the whistles in the same manner. The recordings were made from inside a car with two microphones placed at ear height.

There were a number of significant differences in conditions. On the test the engine pulled no cars. The wind was gusting to 30 m. p. h., whereas the collision occurred on a calm night. The test car was parked, had only one occupant, and was a Ford Torino of unknown vintage rather than a 1964 Chevrolet. There were no motorcycles passing the vehicle from which the tests were made, although the fireman and brakeman testified motorcycles passed the Johnson car.

Trial court overruled plaintiffs' objections, stating the test would be admitted because it "would demonstrate what the sound level of the whistle is, and for no other purpose * * *."

Although there was testimony that the gusting wind would inhibit rather than amplify the whistle noise on the test, we have grave reservations concerning the value of this experiment vis-a-vis its capacity to mislead the jury. It clearly had little relevancy to the issue of what the auto driver and passengers might have heard on the night of the collision. A substantial similarity in conditions minimally would have called for a moving car, several occupants conversing, a number of railroad cars behind two engines, two motorcycles operating in the vicinity, and a cornfield between the car and

the whistle. While trial court attempted to limit the purpose for which the test was admitted, had the recording been made for that purpose there was no need to place the microphones at ear level in an automobile placed on the blacktop road. Despite the limited purpose, there was a danger the jury may have concluded the sound was that which might have been heard by the car occupants just prior to the collision.

Although we are not prepared to say admission of this evidence is reversible error, trial court would have been within its sound discretion in excluding it. See *Palleson v. Jewell Cooperative Elevator,* 219 N.W.2d 8, 15–16 (Iowa 1974); *Galbraith v. George,* 217 N.W.2d 598, 601–602 (Iowa 1974); *Harrison v. Ulicki,* 193 N.W.2d 533, 536–537 (Iowa 1972); *Althof v. Benson,* 259 Iowa 1254, 1257–1258, 147 N.W.2d 875, 876–878 (1967).

B. The other issue relating to reception of evidence concerns the testimony of Baker, defendants' expert witness. Over various objections, he took the blacktop traffic count for July, 1972, projected it over ten years, assumed two trains per day, and on the basis of only one (actual) prior accident in the period, stated the mathematical risk of accident at this crossing was one in 1,400,000 crossings. He was then permitted to state, over the objection it was immaterial and irrelevant, that the risk of an average driver having an accident in the "average" United States was about one in 43,000 miles, opining "the average mile would be about thirty times as much risk as this crossing."

Plaintiffs argue these answers were not based upon the characteristics of the crossing or the facts of the accident, but based solely upon accident experience. They rely on *Evans v. Iowa Southern Utilities Co.,* 205 Iowa 283, 290, 218 N.W. 66, 69 (1928) ("It is apparent from the record that the witness did not purport to base his answer upon his experience, knowledge or training as an engineer, but simply detailed what the average life of the poles would be, according to the estimate determined by the National Electric Association") and *Koch v. Southern Pacific Company,* 266 Ore. 335, 513 P.2d 770, 776 (1973) ("[W]hether drivers of automobile vehicles can cross the tracks safely while exercising reasonable prudence is ordinarily not affected by the number of drivers attempting to do so.")

Defendants assert the objections to the testimony relating to the mathematical risk of accident at the crossing were insufficient. An objection the question called for "the opinion and conclusion of this witness" is insufficiently specific. *Hedges v. Conder,* 166 N.W.2d 844, 856 (Iowa 1969). Other grounds included in the objection were similarly unspecific. When the witness was asked to compare risks (crossing vis-a-vis average mile) the objection was made "this is certainly immaterial and irrelevant. We are talking about a railroad crossing; we aren't talking about an average mile in the United States."

This objection was sufficient to raise the issue of the probative value of this "evidence" in relation to the purpose for which it was offered. *State v. Clay,* 213 N.W.2d 473, 477 (Iowa 1973). Of course, a determination as to the relevancy and the materiality of evidence rests largely on trial court's discretion. *Truscheff v. Abell–Howe Co.,* 239 N.W.2d 116, 125 (Iowa 1976). The basic test of relevancy is whether the evidence offered would make the desired inference more probable than it would be without the evidence. *In re Poulos' Estate,* 229 N.W.2d 721, 726 (Iowa 1975).

Here, plaintiffs' petitions put into issue the dangerousness of the crossing. Obviously defendants sought the admission of this testimony as bearing on that point.

When the objection to the comparison question was made, a number of the facets of the answer were already in evidence without objection.

The traffic count was stipulated into evidence. It is true "the nature or amount of the travel on the highway" is a factor the jury may consider in determining whether a crossing is so unusually dangerous that the railroad must provide more warn-

ing than the usual crossbuck sign, whistle and bell. *Berk v. Arendts,* 254 Iowa 363, 367, 117 N.W.2d 905, 907 (1962); *Wickman v. Illinois Central Railroad Company,* 253 Iowa 912, 917, 114 N.W.2d 627, 630 (1962); *IBA Uniform Jury Instructions* 21.2. But in Iowa the duty of a railroad to adequately warn of a crossing otherwise unusually dangerous is not controlled by the volume of traffic. Traffic volume is considered as it may constitute a diverting circumstance to other vehicle drivers, *Strom v. Des Moines & Central Iowa Railway Co.,* 248 Iowa 1052, 1060, 1063, 82 N.W.2d 781, 785, 788 (1957), or to "the extent that more cars might become involved in a crossing situation." *Hammarmeister v. Illinois Central Railroad Company,* 254 Iowa 253, 263, 117 N.W.2d 463, 468 (1962). However,

> "The amount of traffic does not seem important upon the question of a hazardous condition except that, if such a condition does exist, more travelers upon the highway will be endangered. If it is there, it is just as dangerous to those who do use the road as though their numbers were legion."
> —*Russell v. Chicago, Rock Island & Pacific Railroad Co.,* 249 Iowa 664, 668, 86 N.W.2d 843, 846 (1957), quoted in *Wickman v. Illinois Central Railroad Company,* supra, 253 Iowa at 919, 114 N.W.2d at 631.

See *Hoyt v. Chicago, Rock Island and Pacific Railroad Co.,* 206 N.W.2d 115, 120 (Iowa 1973); 23 Am.Jur. Trials § 7, at 11–12 (1976).

The fact there was only one accident at this crossing in the prior ten years was testified to by the railroad's investigator in response to a question on cross-examination. In *Lindquist v. Des Moines Union Ry. Co.,* 239 Iowa 356, 368–369, 30 N.W.2d 120, 126 (1947), we overruled former decisions and held evidence of prior accidents was admissible on the issue of the existence of a hazardous condition and notice thereof to the defendant. In *Jackson v. Chicago, M., St. P. & P. R. Co.,* 238 Iowa 1253, 1264, 30 N.W.2d 97, 103–104 (1947), we articulated the corollary rule "that it be held compe-

tent to show no such accident had occurred at the same place or with the same instrumentality, under substantially similar circumstances, as tending to show absence of danger and lack of knowledge thereof by a party claimed to be at fault." Subsequent decisions, although emphasizing conditions must have remained constant and the occurrences not too remote, have deleted the former requirement the evidence must be tied to defendant's knowledge. See, e. g., *Christianson v. Kramer,* 257 Iowa 974, 977–978, 135 N.W.2d 644, 646 (1965); *Mead v. Scott,* 256 Iowa 1285, 1291, 130 N.W.2d 641, 644 (1964); *Plumb v. Minneapolis and St. Louis Railway Company,* 249 Iowa 1187, 1197, 91 N.W.2d 380, 387 (1958).

 Obviously any juror with minimal mathematical skills, given the information in the record, could have made the first computation relating to the risk of accident at the crossing. The second part of the expert's answer, relating to the per mile risk of accident of the average driver in the "average" United States, strikes us as having little, if any, relevancy to the issue whether this particular crossing was unusually dangerous.

This question will likely not arise in precisely the same manner on retrial. Nonetheless, we do not hold trial court abused its discretion in permitting the evidence to come in, nor on this record do we find reversible error in this regard.

## IV. *Jury misconduct.*

Supporting their motion for new trial, plaintiffs established that four jurors, without authorization, inspected the crossing during trial. One "calculated with the elevation of the track that there was another two (2) feet of clearance of the headlight over the top of the corn."

 The improper conduct of a juror in viewing the scene of an accident will not justify a new trial unless it is shown the verdict was probably influenced by such actions. *Osterfoss v. Illinois Central R.R.,* 215 N.W.2d 233, 237 (Iowa 1974); see *In re Estate of Cory,* 169 N.W.2d 837, 845 (Iowa 1969).

Our holding in Division I requiring retrial makes it unnecessary for us to determine whether trial court abused its discretion in overruling the new trial motion.

Nonetheless, we note incidents such as this are becoming more commonplace and increasingly jeopardize the finality of expensive and time-consuming trials. See, e. g., *State v. Hall,* 235 N.W.2d 702, 729 (Iowa 1975); *Osterfoss v. Illinois Central Railroad,* 215 N.W.2d at 237–238; *Fischer, Inc. v. Standard Brands, Inc.,* 204 N.W.2d 579, 584–586 (Iowa 1973); *King v. Barrett,* 185 N.W.2d 210, 213 (Iowa 1971); *State v. Little,* 164 N.W.2d 81, 83 (Iowa 1969); *Mead v. Scott,* 256 Iowa 1285, 1290, 130 N.W.2d 641, 644 (1964); *Hamdorf v. Corrie,* 251 Iowa 896, 913–914, 101 N.W.2d 836, 846 (1960).

In our view, a simple oral instruction or admonition, given to the jury at the same time as the other oral directions given pursuant to rule 199(a), R.C.P., would reduce the danger of unwitting jury misconduct. This instruction should inform the jurors they should not make a deliberate, unauthorized visit to any scene or location referred to in the evidence and that they should refrain from conducting any unauthorized experiments or tests relating to any of the issues developed in the case.

Of course we are aware of the old rationale that to so instruct the jury might cause jurors to pursue actions which would not otherwise have occurred to them. This reasoning insults the intelligence and ingenuity of the modern juror. It conclusively presumes the jurors would disobey a court instruction, a concept we are unwilling to adopt.

Upon retrial of this case and upon trial of all other jury cases the presiding judge should follow the above procedure.

We reverse and remand for new trial with directions.

REVERSED AND REMANDED WITH DIRECTIONS.

All Justices concur except LeGRAND, J., who concurs in the result as to division III(A).