MERLE C. BASSETT, Ex'r of the Estate of John David Atwood, Deceased, Plaintiff-Appellee, v. BURLINGTON NORTHERN RAILROAD COMPANY, Defendant-Appellant.

Fifth District   No. 5—84—0356

Opinion filed February 28, 1985.—Rehearing denied April 2, 1985.

Karl D. Dexheimer, of Pope & Driemeyer, of Belleville, and Robert P. Schmidt, of St. Louis, Missouri, for appellant.

Jerome Mirza & Associates, of Bloomington, for appellee.

JUSTICE KARNS delivered the opinion of the court:

A judgment of $700,000 was entered on a jury verdict in the circuit court of Madison County against defendant railroad, Burlington Northern, Inc., in a wrongful death action brought by Merle C. Bassett as executor of the estate of decedent, John David Atwood. The railroad seeks reversal of the judgment, or a new trial, asserting numerous errors for our consideration.

The defendant's first contention is that the evidence failed to support a verdict for the plaintiff and that a directed verdict should have been granted in favor of the railroad. We have summarized the evidence for review in the light most favorable to the plaintiff in order to ascertain whether the verdict should be allowed to stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Atwood was killed on the morning of November 30, 1977, when his car struck the engine of a locomotive owned and operated by the defendant. Atwood was eastbound on Energy Mine Road, a gravel-surfaced county road in a rural area in Williamson County. The weather conditions on the morning of the accident caused some problems to motorists. The road was in a slushy, muddy state and a winter fog limited visibility. The extent of the fog and the visibility restrictions were disputed in the evidence, some witnesses describing the fog as patchy or hazy, others stating that the fog was dense or very heavy. Estimates of the range of visibility varied from 100 yards to three-quarters of a mile.

Defendant's railroad tracks intersected Energy Mine Road at a 90° angle, which is described as the safest angle for a railroad crossing. Photographs taken at the scene depict the neighborhood surrounding the crossing as typically rural, devoid of residences or other buildings, and show that visibility was partially obstructed by trees, brush or embankments in three of the four quadrants at the crossing. The approach visibility in the northwest quadrant was affected by an eight-foot spoils bank. One witness estimated that the top one-third of a southbound train would be visible to an eastbound motorist. The grade of the road on which Atwood approached the tracks descended 27 inches within 50 feet of the crossing. Plaintiff's expert testified that the downgrade exceeded desirable safety levels.

The traffic volume at the crossing was 306 vehicles per day, which included passenger cars, school buses, and heavy trucks carrying coal or explosives. There was no posted speed limit on the road, but an Illinois state trooper testified that the limit would be 55 miles per hour. Train traffic averaged five trains per day, with a daily count ranging from zero to nine trains. The railroad set the maximum speed limit for trains over the crossing at 49 miles per hour.

The county highway department had posted advance warning signs to indicate the existence of the crossing. The railroad's warning signal was a wigwag located in the northeast quadrant of the crossing. The wigwag, which consisted of a red electric light surrounded by a black and white metal disk, was automatically activated to light up, swing back and forth, and sound a bell when a train approached the crossing. Neither crossbucks nor electronic flashers were installed at the crossing.

The only witnesses present at the collision were the crew members on the train. Their collective testimony proved that the train involved in the accident, an extra freight train consisting of two lo-

comotive units, six cars and a caboose, was traveling south at 40 miles per hour. As it drew near the crossing, the air whistle was continuously sounded and the wigwag signal was operating. The headlights, illuminated number boards, and classification lights were all lighted and the brakes were in good working order. The locomotive engineer first saw Atwood's car when it was approximately 20 feet from the train, and he saw the car strike the right side of the lead locomotive and land in a ditch.

Virtually no evidence was available to explain or describe Atwood's actions prior to the collision. He was en route to a business appointment, traveling a road which he had used many times in the past. He was not known to have any sight or hearing impairment. No witness offered an estimate of the speed at which he was traveling. The plaintiff made no attempt to rebut or discredit the railroad's testimony concerning the various warning devices and their operation on the day in question, some of which was corroborated by an independent witness. The plaintiff theorized that the accident occurred as a result of inadequate crossing protection, alleging essentially that the circumstances present at the time of the accident necessitated a warning by electronic flashers rather than the outmoded wigwag signal provided by the railroad. To that end, plaintiff offered the testimony of Dr. John Baerwald, a qualified traffic engineering expert. He visited the crossing some six years after the accident and also reviewed information concerning the circumstances of the accident including the condition of the crossing and its protection devices. He concluded that the crossing was inadequately protected and that crossbucks and electronic flashers should have been provided. Three witnesses who were or had been employed by the railroad in supervisory positions each testified that they had recommended or would recommend the installation of electronic flasher signals at the crossing. One of those witnesses explained during cross-examination that wigwag signals were not preferred anymore because they were outmoded and impractical for the railroad in terms of maintenance and the difficulty with replacement parts. He stated that a wigwag signal adequately protected a railroad crossing. Defendant's engineering expert was the sole witness to unequivocally state that the wigwag signal at the Energy Mine Road crossing was an adequate warning device for the protection of motorists.

■■ ■ A railroad has a common duty to provide adequate warning devices at its crossings. (*Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 444 N.E.2d 1113; *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1970), 121 Ill. App.

2d 445, 257 N.E.2d 216, *aff'd* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.) Where there is any evidence tending to show that an extrahazardous condition existed at the crossing, it is for the jury to determine whether the railroad should have provided additional warnings. (*Baker v. Norfolk & Western Ry. Co.* (1970), 120 Ill. App. 2d 296, 256 N.E.2d 887; *Gibson v. Nenne* (1954), 2 Ill. App. 2d 158, 118 N.E.2d 788.) All railroad crossings present a danger to motorists, and not every additional peril will impose a greater duty on the railroad. Each case must be decided independently by the jury, whose task it is to determine, from the circumstances in existence at the particular crossing at the particular time the vehicle approaches, whether the crossing is extrahazardous and the amount of protection required. *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329.

■ In order for the jury to assess the questions of hazard and protection, the courts have enumerated various factors to take into consideration. As listed in *Baker v. Norfolk & Western Ry. Co.* (1970), 120 Ill. App. 2d 296, 256 N.E.2d 887, they are physical obstructions to vision, volume and speed of vehicular and train traffic, track arrangement, intersecting driveways and roadways, angles at which roadways intersect the tracks, character of the highway, width of the crossing, track elevation, character of the surrounding neighborhood, and sight distance. In the instant case, the trial record contains sufficient evidence for the jury to evaluate the danger at the crossing. in light of the *Baker* factors and to conclude that special perils existed. Additionally, the expert witnesses called by the parties evaluated the Energy Mine Road crossing utilizing most of the *Baker* components and offered their disparate opinions as to the adequacy of the wigwag signal under the conditions existing at the time of the accident. It was within the jury's province to accept or reject their proffered opinions, and we are constrained to accept the decision under the *Pedrick* rule.

■ Defendant also asserts that the issue of the adequacy of protection was wrested from the jury when the court gave plaintiff's instruction No. 17, which read:

"A railroad has a duty to provide adequate protection to the traveling public at its crossings.

Where a crossing is more than ordinarily hazardous or extrahazardous, the railroad has a duty to provide automatic electronic flashing light signals at the crossing."

Defendant vigorously argues that this instruction grossly misstates the railroad's legal duty and so prejudiced its case that a new trial

is warranted. We agree.

The cases cited above unambiguously hold that the amount of protection required at a crossing is strictly a jury question to be determined from the circumstances of each case. From the facts presented in the instant case, the jury could well have determined that the wigwag signal adequately protected the Energy Mine Road crossing. The instruction, however, specifically mandated that electronic flashers were required at extrahazardous crossings. That portion of the instruction is inaccurate and insupportable in law. It impermissibly accroached the jury's function and, in effect, directed a finding against the railroad. The defendant is therefore entitled to a new trial.

The cases cited above yield principles by which the courts can be guided when instructing the jury in cases which present the issue of adequacy of protection at railroad crossings. A finding of extrahazardousness is implied in a jury decision holding a railroad liable for failure to adequately protect its crossing, and therefore a special finding of extrahazardousness is not required. (*Baker v. Norfolk & Western Ry. Co.* (1970), 120 Ill. App. 2d 296, 303, 256 N.E.2d 887, 892.) The better practice, however, would be to particularize the instructions in order to clarify the dual questions of hazard and protection necessary to a finding of liability. The jury should be instructed that it is their duty to determine initially whether a crossing is extrahazardous. In that regard, the *Baker* factors may be listed in the instructions for the jury's assistance in their deliberations. A delineation of the factors would also prove helpful to the jury when called upon to assess the opinions which may be offered by experts who testify to crossing hazards. The jury should be instructed, secondly, that it is their duty, upon a finding of extrahazardousness, to determine whether the crossing in question was adequately protected given all the circumstances in existence at the time of the occurrence which gave rise to the litigation.

Because a new trial has been ordered, we believe it is instructive and in the best interest of both parties to comment on certain other points of error raised by defendant in order to forestall potential prejudice on remand.

Michael Collins, a brakeman for defendant railroad, had been an assistant superintendent in the region of the accident for a period of two weeks before the occurrence. He was called and examined by plaintiff's counsel pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). Collins' admission as an adverse witness was in derogation of the provi-

sion of section 2—1102 which requires that the witness must hold a supervisory position with the opposing party at the time the witness is called to testify. *Mazanek v. Rockford Drop Forge Co.* (1981), 98 Ill. App. 3d 956, 424 N.E.2d 1271; *Kuhn v. General Parking Corp.* (1981), 98 Ill. App. 3d 570, 424 N.E.2d 941; *Bansch v. Donnelly* (1979), 77 Ill. App. 3d 922, 396 N.E.2d 869.

The gist of the testimony elicited from Collins was a summary of isolated statements made by Collins prior to trial, read by plaintiff's counsel from a transcript of a coroner's inquest and from a letter written by Collins to his supervisor in 1979. It is obvious from the trial transcript that plaintiff's counsel's sole purpose in his adverse examination of Collins was to impart to the jury potentially damaging information which he was unable to put into evidence through legally permissible means. That the court's favorable rulings on defendant's objections to the improper questioning were insufficiently curative is illustrated by the following exchange:

"Q. [plaintiff's counsel] Well, you were also asked — In fact, the very next question that somebody asked you there was:

'So, it is not an isolated crossing then?'

And you said, 'No, it is our main coal route between Wyoming and Southern Illinois.'

Is that true?

MR. SCHMIDT [defense counsel]: Same objection, Your Honor. He is not impeaching with that question, and it is a totally improper way to examine the witness.

THE COURT: Objection will be sustained. Rephrase the question, counselor.

MR. MIRZA [plaintiff's counsel]: Is that true? Was that your main coal route between Wyoming and Southern Illinois?

A. Yes, it was."

The examination of Collins was blatantly improper almost in its entirety and should not be repeated on retrial. See *Karlin v. Inland Steel Co.* (1979), 77 Ill. App. 3d 183, 395 N.E.2d 1038.

■■ ■ Joyce Stratton, an intimate friend of the decedent at the time of the accident, testified to her close relationship to Atwood. Defendant made an offer of proof by which Stratton would testify that she and Atwood were planning to be married. The marriage testimony was not admitted, despite the fact that two witnesses called by plaintiff had testified that Atwood was devoutly Catholic and would not remarry because he considered himself bound to his ex-wife under the rules of his church. Defendant argues that the issue raised by the court's rejection of the marriage testimony became

important when plaintiff's economic expert suggested a substantial figure for estimated economic loss which was computed based on the assumption that Atwood would remain single. We agree with defendant that it should have been permitted to contradict that assumption after the court allowed the plaintiff to open up the issue. (See *Martin v. Allstate Insurance Co.* (1981), 92 Ill. App. 3d 829, 416 N.E.2d 347.) Moreover, we believe that the marriage testimony was admissible as an exception to the hearsay rule. It is well established that a person's declarations as to his or her state of mind are admissible to show that state of mind and such other things as proof of a state of mind tends to establish. (*City of Streator v. Industrial Com.* (1982), 92 Ill. 2d 353, 365, 442 N.E.2d 497, 503.) The rule should have been applied to Stratton's proffered testimony concerning Atwood's marital intentions.

■ Defendant complains that the testimony of Dr. Charles Linke, plaintiff's economics expert, should have been excluded and that the railroad was prejudiced by having inadequate opportunity to prepare for and rebut the expert testimony. The record shows that defendant relied on plaintiff's representation that the expert would not be called. The court allowed a deposition of Linke in the evening during the week of the trial. We accept defendant's counsel's assertion that the surprise and haste caused hardship in preparation for rebuttal and trust that the court will ensure that the situation will not be repeated.

The judgment of the circuit court of Madison County is reversed and the case is remanded for a new trial.

Reversed and remanded.

JONES, P.J., and WELCH, J., concur.