KATHY J. BRENNAN, Plaintiff-Appellant, v. WISCONSIN CENTRAL LIMITED *et al.*, Defendants-Appellees.

Second District No. 2—91—0484

Opinion filed April 23, 1992.

Stephen M. Passen and Allen C. Schwartz, both of Stephen M. Passen, Ltd., of Chicago (Jay Paul Deratany, of counsel), for appellant.

Patrick J. Larkin, of Oppenheimer, Wolfe & Donnelly, of Chicago (James A. Fletcher, of counsel), for appellees.

JUSTICE McLAREN delivered the opinion of the court:

This appeal arises out of a collision between an automobile operated by Kathy J. Brennan, plaintiff, and a freight train owned by Wisconsin Central Limited (WCL), an Illinois corporation, in unincorporated Antioch Township, Illinois. Plaintiff filed a three-count complaint for personal injuries against WCL, its employees David A. Koepke and Ronald G. Callaway, and the North Shore Improvement Association alleging that defendants' negligence was the proximate cause of her injuries. After the close of the evidence, the court granted a directed verdict in favor of defendants on several counts of plaintiff's complaint, and the jury returned a verdict in favor of defendants on all remaining counts. Plaintiff's post-trial motion for a judgment notwithstanding the verdict or alternatively for a new trial was denied, and plaintiff appealed. We affirm in part, reverse in part, and remand.

The collision occurred where WCL's north/south mainline track intersects with Lake Shore Drive in unincorporated Antioch Township. Lake Shore Drive is an east/west two-lane, black-topped road which crosses the track at a 90 degree angle and comes to a dead end within a subdivision east of the crossing. The crossing is equipped with one reflectorized crossbuck on each side of the track and no active warning devices. Approximately 50 feet east of the track, Lake Shore Drive intersects with a gravel road known as L Street, which runs in a northeasterly/southwesterly direction.

The record reveals that on January 9, 1988, at approximately 5:20 p.m., it was dusk, the weather was clear, and there was nearly one foot of snow on the ground. Kathy Brennan was traveling westbound along Lake Shore Drive, and the WCL train was approaching the crossing from the south at approximately 35 miles per hour. As the vehicle approached the crossing, both plaintiff and her passenger, Pamela Kegerris, testified that they looked both ways along the track but did not see or hear anything until they were directly on the track and the headlight of the train was shining through the driver's side window. At this point, train number T41, consisting of 2 locomotives and 65 freight cars, collided with plaintiff's vehicle.

At the time of the accident, the engine was operating in a fashion known as long end forward, meaning that the engineer and conductor were positioned in the rear of the engine which leads the train. David Koepke, the conductor, testified that he first observed Brennan's automobile about a quarter of a mile from the crossing when her car slowed at L Street and turned onto Lake Shore Drive. When Brennan's automobile passed the crossbuck sign, Koepke realized it was not going to stop and directed Callaway, the locomotive engineer, to apply the emergency brake. Both Callaway and Koepke testified that the warning bell and horn were sounded in the required fashion prior to the collision and that the headlight was functioning on its brightest setting.

Plaintiff's complaint alleged several acts of negligence by the various defendants. However, at the close of the evidence, plaintiff was allowed to orally amend her complaint to conform to the evidence. The complaint, as amended, asserted that WCL, Koepke and Callaway were negligent in:

(1) constructing and maintaining the approach to the crossing at an excessive grade;

(2) failing to remove brush, shrubs or trees located on the railroad right-of-way within 500 feet of the Lake Shore Drive grade crossing which materially impaired the view that westbound motorists had of approaching trains;

(3) failing to provide adequate warnings at the Lake Shore Drive crossing such as signs, flashing lights, gates or guards;

(4) failing to stop or apply the brakes in a timely manner;

(5) failing to sound the bell, horn or otherwise give timely warning;

(6) operating the train at a speed greater than was reasonable and proper given the conditions existing at the Lake Shore Drive crossing;

(7) failing to maintain a proper and sufficient lookout;

(8) failing to run the engine short end forward; and

(9) failing to operate and manage the train with reasonable care and caution having due regard to the conditions existing at the crossing.

After the close of the evidence, the court granted a directed verdict for Koepke on all of the above-mentioned claims and as to WCL and Callaway on all claims except those based on the alleged failure to sound the horn and to remove trees and brush. After submitting the remaining claims to the jury, a verdict was returned in favor of defendants, and judgment was entered on the verdict. Plaintiff seeks review of the trial court's denial of her post-trial motion for a judgment *n.o.v.* or, alternatively, for a new trial.

Judgments *n.o.v.* should be entered or verdicts directed only when all of the evidence, viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) However, reversal of the denial of a motion for a new trial on appeal requires a showing that the trial court abused its discretion. *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 442.

I

The first contention in plaintiff's post-trial motion is that the trial court erred in granting defendant's motion *in limine* which limited proof of WCL's alleged negligence in failing to erect additional warning devices to standards of the Illinois Commerce Commission (ICC). This ruling was based on the trial court's finding that the Federal Railroad Safety Act (FRSA) (45 U.S.C. §421 *et seq.* (1986)) expressly preempts State law concerning the adequacy of existing crossing signals. We will first address the court's ruling that plaintiff's common-law claim that WCL was negligent in failing to install additional warning devices at the subject crossing was preempted by Federal law.

■ The Supreme Court has indicated that there are three circumstances in which the supremacy clause of the United States Constitution preempts State law. First, Congress can explicitly define the extent to which its enactment preempts State law. In this situation, the courts will attempt to narrowly tailor the scope of preemption to match congressional intent. Second, a congressional intent to exclusively occupy a field of regulation may be inferred when the regulatory scheme is so comprehensive that there is no room for supplemen-

tary State laws. Third, State law is preempted to the extent that it actually conflicts with Federal law, thereby making compliance with both State and Federal requirements impossible. (*English v. General Electric Co.* (1990), 496 U.S. 72, 79, 110 L. Ed. 2d 65, 74, 110 S. Ct. 2270, 2275.) Section 434 of the FRSA is helpful in specifically describing its preemptive effect. It states that the "standards relating to railroad safety shall be nationally uniform to the extent practicable." However, it also contains the following savings clause:

"A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce." 45 U.S.C. §434 (1986).

With the adoption of the FRSA, Congress required the Secretary of Transportation to study and develop solutions to problems associated with railroad grade crossings. (45 U.S.C. §433 (1986).) Under the Highway Safety Act (23 U.S.C. §§401 through 404 (1986)), the Secretary is responsible for developing uniform standards and to approve State-designed highway safety programs as a condition precedent to the State's receipt of Federal highway funds. Pursuant to its statutory responsibility, the Secretary of Transportation adopted the Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD). (23 C.F.R. §§646.214(b)(1), 655.603 (1991).) However, the MUTCD contains the following language which delegates the responsibility for selecting warning devices to local agencies with jurisdiction over a given rail crossing:

"The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority. Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein." (Manual on Uniform Traffic Control Devices for Streets and Highways §8A–1 (1988).)

It further states:

"Due to the large number of significant variables which must be considered there is no single standard system of active traf-

fic control devices universally applicable for grade crossings. Based on an engineering and traffic investigation, a determination is made whether any active traffic control system is required at a crossing and, if so, what type is appropriate. Before a new or modified grade crossing traffic control system is installed, approval is required from the appropriate agency within a given State." Manual on Uniform Traffic Control Devices for Streets and Highways §8D—1 (1988).

In turn, Illinois law authorizes and directs the ICC as follows:

"The Commission shall have power, upon its own motion, or upon complaint, and after having made proper investigation, to require the installation of adequate and appropriate luminous reflective warning signs, luminous flashing signals, crossing gates illuminated at night or other protective devices in order to promote and safeguard the health and safety of the public. Luminous flashing signal or crossing gate devices installed at grade crossings, *which have been approved by the Commission,* shall be deemed adequate and appropriate. The Commission shall have authority to determine the number, type and location of such signs, signals, gates or other protective devices which, however, shall conform as near as may be with generally recognized national standards ***." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401.

Nevertheless, the extent to which the FRSA preempts State railroad safety laws has been the subject of much litigation. (*Smith v. Norfolk & Western Ry. Co.* (N.D. Ind. 1991), 776 F. Supp. 1335 (partial summary judgment granted because the local agency determined what safety devices were required prior to the plaintiff's accident); *Anderson v. Chicago Central & Pacific R.R. Co.* (N.D. Ill. 1991), 771 F. Supp. 227 (common-law negligence action was not preempted because the record lacked evidence that the ICC determined the existing warnings were appropriate); *Southern Pacific Transportation Co. v. Maga Trucking Co.* (D. Nev. 1991), 758 F. Supp. 608 (although the agency recommended the crossing be upgraded, preemption did not occur because the improvements had not been made at the time of the accident); *Taylor v. St. Louis Southwestern Ry. Co.* (D. Kan. 1990), 746 F. Supp. 50 (denying a motion *in limine* based on a finding that the railroad's common-law duty was not preempted by the FRSA).) There is even a split of authority in the Federal Courts of Appeal. In *Marshall v. Burlington Northern, Inc.* (9th Cir. 1983), 720 F.2d 1149, the Ninth Circuit found that, based on the Federal regulatory scheme and rules promulgated by the Secretary of Transportation, a common-

law duty to provide adequate warnings at railroad crossings was not subject to preemption *until* the responsible State agency determined the appropriate type of warning device to be installed. Contrary to *Marshall*, however, the Eighth Circuit ruled that a railroad may be liable in common-law negligence even if the local agency approved the warning devices at the subject crossing. (*Karl v. Burlington Northern R.R. Co.* (8th Cir. 1989), 880 F.2d 68.) Although a recent decision rejected *Marshall's* implication that a railroad would be insulated from liability once a crossing was upgraded by the State, it held that State common-law liability is not abrogated by Federal provisions in the absence of an affirmative decision by the applicable State agency on the adequacy of existing warning devices. *Easterwood v. C S X Transportation, Inc.* (11th Cir. 1991), 933 F.2d 1548, 1556.

Defendants contend that a State's common-law duty to provide a safe crossing was preempted according to the express terms of the FRSA when the Secretary adopted the MUTCD as the national standard. (See *Hatfield v. Burlington Northern R.R. Co.* (10th Cir. 1992), 958 F.2d 320; *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.* (D. N.M. 1990), 754 F. Supp. 1526, 1531.) Although the MUTCD contains standards concerning the location, size and appearance of the various warning devices, it lacks guidelines designating the type of active devices appropriate at crossings having particular features. Instead, it states that "there is no single standard system of active control devices universally applicable for grade crossings" and delegates the responsibility for selecting appropriate warning devices to State agencies with jurisdictional authority. Our review of the record coupled with our own diligent research reveals that neither Congress nor the Illinois legislature has enacted a comprehensive set of regulations encompassing the types of warning devices required at crossings having particular features.

In Illinois, safety guidelines for railroad tracks, facilities and equipment are set forth in section 7401 of the Illinois Commercial Transportation Law. (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401.) Its legislative history reveals an intent to eliminate issues concerning the adequacy of railroad crossings *only after* the ICC has investigated and ordered the installation of a particular warning device. (*Hunter v. Chicago & North Western Transportation Co.* (1990), 200 Ill. App. 3d 458, 465-66, citing 82d Ill. Gen. Assem., House Proceedings, April 22, 1982, at 114-23.) This procedure is consistent with applicable case law discussing FRSA's preemptive effect of State safety guidelines. See *Easterwood*, 933 F.2d at 1556; *Anderson*, 771 F. Supp. at 228; *Taylor*, 746 F. Supp. at 55.

■ The record in this case reveals no evidence that the ICC investigated the Lake Shore Drive crossing and made a determination under either the MUTCD or the applicable statutory provision (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401) concerning the adequacy of existing signals. As previously stated by Illinois courts, "the fact that the Illinois Commerce Commission has not ordered a certain warning or signaling device at a crossing does not thereby relieve a railroad of negligence in not providing such a device." (*Hunter*, 200 Ill. App. 3d at 466; *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1970), 121 Ill. App. 2d 445, 456, *aff'd* (1971), 49 Ill. 2d 118.) Section 434 of the FRSA allows the States to "adopt or continue in force an additional or more stringent law *** relating to railroad safety" when necessary to eliminating a safety hazard as long as it is not incompatible with Federal law. (45 U.S.C. §434 (1986).) This language exhibits that the Federal government did not intend to preempt the field of railroad safety by adopting a manual which is completely devoid of relevant regulations. Furthermore, preempting the field of railroad safety by adopting the MUTCD, which delegates all responsibility for determining the adequacy of warning devices to the applicable State agency, would lead to the absurd result that a statute designed to promote railroad safety would effectually immunize a railroad from liability with respect to safe crossings in the absence of affirmative action by the State. This result is antagonistic to both the purpose of the FRSA and its specific language concerning the extent of preemption. (45 U.S.C. §434 (1986).) Accordingly, we find that the railroad's common-law duty to provide a safe crossing has not been preempted by the terms of the FRSA under the rationale of either *Marshall, Easterwood*, or *Karl*.

Because all railroad crossings present a danger to motorists, not every peril will impose a duty on the railroad. (*Basset v. Burlington Northern R.R. Co.* (1985), 131 Ill. App. 3d 807, 812; *Merchants*, 121 Ill. App. 2d at 455.) Illinois courts have held that the railroad's duty to provide additional warnings arises when "special circumstances," also defined as "extrahazardous conditions," are present. (*Dunn v. Baltimore & Ohio R.R. Co.* (1989), 127 Ill. 2d 350, 357; *Basset*, 131 Ill. App. 3d at 812; *Puckett v. Soo Line R.R. Co.* (7th Cir. 1990), 897 F.2d 1423, 1427 (applying Illinois law).) Because there is no fixed rule as to what constitutes special circumstances, "[e]ach case must be decided independently by the jury, whose task it is to determine, from the circumstances in existence at the particular crossing at the particular time the vehicle approaches, whether the crossing is extrahazardous and the amount of protection required." (*Basset*, 131 Ill. App. 3d

at 812; see also *Merchants*, 121 Ill. App. 2d at 456.) Several factors the jury considers in assessing the questions of hazard and protection are population, traffic, physical obstructions to vision, volume and speed of vehicular and train traffic, track arrangement and elevation, width of the crossing, intersecting driveways and roadways, character of the surrounding neighborhood, and the effect to which confusion, incident to the railroad or other business in the area, would have on the sight or hearing of ordinary signals. *Hunter*, 200 Ill. App. 3d at 466; *Basset*, 131 Ill. App. 3d at 812; *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 42.

Prior to trial, however, the court entered the following order pursuant to defendants' motion *in limine*:

> "The Motion in Limine—Evidence That The Crossing Should Have Been Equipped With Flashing Signals or Other Warning Devices is granted to the extent that plaintiff's proof and argument concerning her claim that additional warning devices should have been installed at the Lake Shore Drive crossing shall be limited to proof and argument that such additional warning devices were required under the standard applied by the Illinois Commerce Commission; otherwise, said motion is denied."

Because neither party presented evidence of ICC proceedings which determined the adequacy of the existing warning devices at the Lake Shore Drive crossing at trial, the court effectually directed the jury to sit in the position of the ICC and determine whether additional warning devices were warranted. The court stated as follows: "We are going to say to the jury these are the standards which are established. Under those standards, was this sign the sign that's required."

In an effort to prove the applicable standards, the defense presented a pamphlet entitled "Recommended Procedures for the Initiation and Execution of the Stipulated Agreement." The pamphlet specifies procedures to be followed in ICC proceedings to alter a crossing without a hearing when the interested parties agree on the form of improvement. However, the court conclusively accepted this pamphlet as the applicable legal standard governing warning devices at crossings. Consequently, when plaintiff attempted to prove the railroad breached common-law standards through the testimony of Robert Lippman, a civil engineer and land surveyor who investigated the subject crossing, the court barred plaintiff from producing any evidence or testimony it deemed outside the standards set forth in the pamphlet. As a result, all portions of Lippman's testimony concerning his

opinion that additional warning devices were required under a common-law, reasonable-person standard were stricken.

■ Because we have determined that the railroad's common-law duty to provide a safe crossing has not been preempted, the pamphlet submitted by defendant was improperly admitted for the purpose of determining the standard of care on the issue of the adequacy of warning devices. We emphasize, however, that this holding does not preclude the admissibility of the pamphlet for another purpose. "[E]vidence of standards may be relevant and admissible even though the standards have not been imposed by statute or promulgated by a regulatory body and therefore do not have the force of law." *Ruffiner v. Material Service Corp.* (1987), 116 Ill. 2d 53, 58, citing *Merchants*, 49 Ill. 2d at 125 (where a pamphlet containing standards concerning grade crossing protection was admissible because it did not conclusively determine the standard of care, and the jury was not instructed that it did); see also *Paulison v. Chicago, Milwaukee, St. Paul & Pacific R.R., Inc.* (1979), 74 Ill. App. 3d 282, 288.

■ We further determine that the court erred in striking Lippman's testimony concerning the adequacy of existing warning devices at the subject crossing. Because Lippman stated in his deposition that he did not consider ICC standards in his investigation, the court struck his testimony based on a finding that the disclosure requirements of Supreme Court Rule 220 (134 Ill. 2d R. 220) mandated this result. Because Lippman is not a *legal* expert, he is not qualified to testify as to the legal applicability or legal substance of ICC standards. However, considering our prior ruling that the FRSA did not preempt WCL's common-law duty to provide a safe crossing, Lippman was entitled to render an opinion of the Lake Shore Drive crossing when couched in terms of common-law standards, regardless of his knowledge of or reliance on the standards set forth in the pamphlet.

■ Having determined that Lippman's testimony should have been admitted, we conclude by determining that the trial court erred in directing a verdict on the issue of the adequacy of the warning devices at the crossing. A motion for a directed verdict should be granted only when all of the evidence, viewed favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510.) In this case, the court entered the directed verdict on the basis that there was insufficient evidence that the crossing should have been upgraded under the standards set forth in the improperly considered pamphlet entitled Recommended Procedures for the Initiation and

Execution of the Stipulated Agreement. Additionally, because we have ruled that the FRSA has not preempted the railroad's common-law duty to provide a safe crossing, the standards set forth in the pamphlet are not probative of whether the crossing should have been upgraded. If Lippman's opinion concerning the adequacy of the crossing was not stricken, the jury could have determined that WCL breached its common-law duty to provide a safe crossing. Therefore, the court erred in directing a verdict on the adequacy of the warning devices, and plaintiff is entitled to a new trial on this issue.

## II

Next, plaintiff contends that the court erred in directing a verdict in favor of WCL on the issue of its alleged negligence in maintaining the crossing at an excessive grade. Pursuant to defendant's motion *in limine*, the court found that WCL's duty to maintain the grade was confined to an area of two feet from the nearest rail or six feet from the center line of the track. Consequently, the court limited proof of WCL's negligence to this area. This ruling was based on section 7401 of the Illinois Commercial Transportation Law (Ill. Rev. Stat. 1987, ch. 95½, par. 18c—7401) and ICC rule 204 (92 Ill. Adm. Code §1535.204 (1985)). The portion of section 7401 discussing the grade of approaches to crossings states:

> "[U]nless otherwise ordered by the Commission, [every rail carrier operating in the State of Illinois] shall construct and maintain the approaches [of every highway crossing over its tracks] at a grade not more than 5% within the right of way for a distance of not less than 6 feet on each side of the centerline of such tracks; provided, that the grades at the approaches may be maintained in excess of 5% only when authorized by the Commission." (Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401.)

However, ICC rule 204 also contains the following requirements for approaches to grade crossings:

> "Unless the Commission otherwise specifically orders, the grade line of highway approaches to grade crossings hereafter established or substantially reconstructed shall be as follows: From the outer rail of the outermost track coincident with a tangent to the tops of the rails for about 24 inches, thence for a distance of 25 feet ascending or descending at a grade which shall not deviate more than 1% from said tangent, thence to the right-of-way line (and as far beyond as the Commission's

control may extend in any case) at a grade not to exceed 5%." 92 Ill. Adm. Code §1535.204 (1985).

At trial, plaintiff's expert, Robert Lippman, testified that the grade of the crossing when measured within the area designated by the court was 11½%. In his opinion, the crossing constituted a hazard, since "text books, and the ICC rules and regulations state that *** grades should be less than 5 per cent at railroad crossings." At the close of all the evidence, the court directed a verdict in favor of WCL on this issue on the basis that the evidence could not support a finding by a reasonable jury that the grade at the Lake Shore Drive crossing was the proximate cause of plaintiff's injuries. We agree.

■ The record does not contain any evidence other than Lippman's testimony to indicate that the grade of the crossing contributed to plaintiff's inability to see the oncoming train and stop. Even if the grade of the crossing did not comply with the applicable statute and ICC regulations, a finding that the grade affected this occurrence, when based on the evidence presented, would be nothing more than speculation. Violation of a statute designed to protect human life or property is *prima facie* evidence of negligence. In order to recover, however, a plaintiff must still prove that the violation proximately caused his injury. (*Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 219-20.) A search of the record reveals no offer of proof by plaintiff indicating evidence which would prove that the grade of the subject crossing was the proximate cause of the accident. Accordingly, the court's ruling on the motion *in limine* did not affect the ruling on the directed verdict. Applying the *Pedrick* standard (*Pedrick*, 37 Ill. 2d at 510), we find that the court did not err in directing a verdict for WCL on the issue of negligence in maintaining an excessive grade.

■ Plaintiff also claims that she presented sufficient evidence to warrant a jury verdict on the issue of Callaway and Koepke's negligence in failing to maintain a proper and sufficient lookout. This allegation encompasses her claim that defendants were negligent in operating the train long end forward. Although Callaway's view of the track was limited to the west side when the train was operated in this fashion, Koepke had a full view of the east side. It is undisputed that the locomotive is designed to be run in either direction and that there are windows on both ends of the cab to allow crew members to observe the track. Although the record reflects that the view is better when the engine is run short end forward, it lacks evidence that the view is inadequate when run long end forward. Such evidence is insuf-

ficient to establish that Koepke and/or Callaway breached their duty to maintain a proper lookout.

Moreover, the essential question in determining if defendants kept a proper lookout is whether they failed to do that which a reasonably prudent person would under the circumstances. (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 511.) It is undisputed that Koepke observed plaintiff's vehicle traveling on L Street when the train was a quarter of a mile from the crossing and that he continued to watch the vehicle proceed slowly toward the crossing. Although Koepke did not alert Callaway of the motorist until her car passed the crossbuck, his actions did not constitute a breach of any duty. While Illinois law requires railroad crews to keep a proper lookout for individuals in the vicinity of tracks, it does not require emergency stops whenever railroad personnel observe an individual near the tracks. (*Puckett*, 897 F.2d at 1425.) A person traversing a railroad crossing has a duty to look and listen for an approaching train (*Hamilton v. Atchison, Topeka & Santa Fe Ry. Co.* (1988), 175 Ill. App. 3d 758, 760), notwithstanding a statutory duty to "exercise due care and caution *** [and] stop within 50 feet but not less than 15 feet from the nearest rail of the railroad" in circumstances when an approaching train creates an immediate hazard. (Ill. Rev. Stat. 1989, ch. 95½, par. 11—1201.) Therefore, Koepke was under no duty to act until plaintiff passed the crossbuck. Accordingly, we find that the trial court did not err in directing a verdict on the issue of Koepke's and/ or Callaway's negligence in failing to maintain a proper lookout.

■ Next, plaintiff contends that the court erred in directing a verdict in favor of *Koepke* on the issue of his alleged failure to sound the train's warning whistle. Because Koepke acted as conductor on the train, the court ruled that he had no duty to sound the horn, since only Callaway, the engineer, had access to the controls for these devices. We need not determine whether this ruling was error, because the trial court submitted the claim of failure to sound the horn *against WCL and Callaway* to the jury, which returned a verdict in favor of defendants. Even if the identical claim against *Koepke* was submitted to the jury, and he was held to the same standard as Callaway, we are satisfied that the jury could only have returned a verdict in Koepke's favor. Accordingly, we find no error.

■ Finally, plaintiff contends that the court erred in directing a verdict in favor of WCL and Callaway on the claim of negligence in operating the train at an excessive rate of speed. Trains must be operated at speeds which are consistent with a due regard for the safety of passengers and the safety of persons crossing over the tracks.

(*Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 415.) It is undisputed that the speed of the train was below the 40 mile-per-hour speed limit established by regulations promulgated by the Secretary of Transportation. (49 C.F.R. 213.9 (1990); 45 U.S.C. §434 (1986); see also *Easterwood*, 933 F.2d at 1553.) The testimony was also undisputed that, although the sun had set, the air was clear and Callaway attempted to stop the train when Koepke's duty to call out a warning arose. Without evidence that conditions existed which would have made the speed of the train excessive, we find no error in directing a verdict for defendants on this issue.

## III

 Plaintiff further asserts that the trial court erred in granting defendant's motion *in limine* and barring all evidence concerning WCL's alleged routine practice and custom of failing to sound its whistle or horn when approaching the Lake Shore Drive crossing. During the hearing on the motions *in limine* in this case, plaintiff's counsel stated that the proposed witnesses would testify that they "as a general practice have not heard the horn." Evidence of an organization's routine practice may be established by opinion testimony of a person with personal knowledge or by the introduction of specific instances of conduct sufficient in number to support a finding of routine practice. However, this evidence must be sufficiently detailed and specific, and the situations involved must be similar enough to give rise to a reliable inference. (*Bradfield v. Illinois Central Gulf R.R. Co.* (1987), 115 Ill. 2d 471, 480 (Ryan, J., dissenting).) In this case the substance of the proposed testimony based on plaintiff's blanket statement is speculative. Without more specific information concerning the basis for the witnesses' statements, we are unable to assess any prejudice caused by the exclusion. (See *Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 722.) Accordingly, we find no abuse of discretion in granting defendant's motion *in limine*.

## IV

Next, plaintiff contends that the court erred by instructing the jury on WCL's duty to remove trees and brush from the crossing as follows:

> "There was in force in the State of Illinois at the time of the occurrence in question a certain statute and administrative code regulations [*sic*] which provided that:
>
> 1. Every railroad shall keep its right of way adjacent to its track reasonably clear of brush, shrubbery, trees, weeds, crops

and all unnecessary permanent obstructions such as unauthorized signs and billboards for a distance of at least 500 feet each way from every grade crossing where such things would materially obscure the view of approaching trains to travellers on the highway.

\* \* \*

If you decide that a party violated the statute or rule on [the] occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent before and at the time of the occurrence." See Illinois Pattern Jury Instructions, Civil, No. 60.01 (3d ed. 1991).

The language concerning the railroad's duty to remove trees and brush is identical to ICC rule 205. (92 Ill. Adm. Code §1535.205 (1985).) Plaintiff objects to this characterization of WCL's duty to remove trees and shrubs on the basis that the instruction she tendered, which was refused, contains the following more appropriate language quoted from the Illinois Commercial Transportation Law:

"Every rail carrier operating in this State shall remove from its right of way at all grade crossings within the State, such brush, shrubbery and trees as is reasonably practical for a distance of not less than 500 feet in either direction from each grade crossing." Ill. Rev. Stat. 1989, ch. 95½, par. 18c—7401.

The standard for assessing the adequacy of jury instructions is whether they fully, fairly, and comprehensively inform the jury of applicable legal principles. (*Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990), 196 Ill. App. 3d 5, 18.) The trial court's refusal to give an instruction will not form the basis of reversal unless it results in undue prejudice to a party. (*Ferry v. Checker Taxi Co.* (1987), 165 Ill. App. 3d 744, 749.) Plaintiff asserts prejudice in that the given instruction implies that an obscured view is permissible, although the language of the statute requires removal of all trees and shrubs and does not allow for obscured views. Thus, she contends that the court erred in refusing a proper instruction and giving one which lowered WCL's duty and improperly increased her burden of proof.

■■ We find no error in the instruction as given. At the close of the evidence, plaintiff was allowed to orally amend her complaint to conform to the proofs. On the issue of WCL's negligence in failing to remove trees and shrubs, her complaint, as amended, asserted that WCL "failed to remove brush, shrubs or trees located on the railroad right-of-way within 500 feet of the Lake Shore Drive grade crossing

which *materially impaired* the view that westbound motorists had of approaching trains." A review of both instructions reveals that the instruction given more appropriately defines WCL's duty as it relates to plaintiff's specific claim of negligence. Accordingly, we find no abuse of discretion in giving this instruction.

## V

At trial, defendants produced evidence of experiments conducted at the subject crossing by their expert, Rudolf Mortimer. In an effort to measure plaintiff's ability to see and hear a train at the subject crossing, Mortimer sat in a car at various points along the approach to the crossing and observed a subject as he moved to various locations along the track. This same experiment was later conducted using the engine involved in the collision, and numerous posed photographs were taken at various points along the track. Plaintiff objects to the portions of Mortimer's testimony relating to these experiments on the basis that the essential conditions at the time of the experiments were not the same as those at the time of the accident. Specifically, plaintiff objects to the time the experiments were conducted on the basis that the experiments took place during the day, when the collision occurred after the sun had set. Second, she contends that the subjects of the experiment were observed from fixed points, when at the time of the collision both the train and automobile were in motion. Third, plaintiff objects to the use of a 1990 Mercury Sable in the experiments because she was operating a 1985 Monte Carlo at the time of the collision, and defendants never proved that a 1990 Sable offered the same view or vantage point of the tracks. Plaintiff further contends that Mortimer's testimony concerning the illumination of train headlights was improperly admitted because he lacked specialized knowledge or experience of train headlights.

■■ The admissibility of experiments or tests depends on whether the "essential conditions" or "essential elements" of the experiment are substantially similar to those existing at the time of the accident. (*Rios v. Navistar International Transportation Corp.* (1990), 200 Ill. App. 3d 526, 532.) Because the "essential elements" or "essential conditions" vary, each case must be decided individually. If a test performed is represented to be a reenactment of the occurrence at issue, it is necessary to show that the test was performed under conditions that closely duplicate those at the time of the accident. (*Galindo v. Riddell, Inc.* (1982), 107 Ill. App. 3d 139, 144.) However, "if an experiment is intended to test only one aspect or principle directly related to the cause or result of the accident, the 'essential con-

ditions' need not involve an exact duplication of the accident conditions." (*Rios*, 200 Ill. App. 3d at 533; see also *Galindo*, 107 Ill. App. 3d at 144.) Nevertheless, the admissibility of experimental evidence is within the sound discretion of the trial court, whose decision will not be reversed absent a clear abuse of discretion. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 416; *Kent v. Knox Motor Service, Inc.* (1981), 95 Ill. App. 3d 223, 225.

■■ Mortimer performed several experiments with varying conditions to develop speed, sound and sight factors which he used together in estimating the points at which a reasonable driver would notice the headlight and horn of a train. Although these "essential conditions" did not exactly parallel the conditions at the time of the accident, the experiments were neither intended nor purported to be a reenactment. Furthermore, because the photographs of the locomotive at various points on the track were not a substantially similar depiction of the circumstances at the time of the collision, they were not admitted into evidence, thereby eliminating any alleged prejudicial effect. Plaintiff correctly notes that Mortimer stated in his deposition that train and automobile headlights are "totally dissimilar" and that his past experiments principally utilized automobile headlights. However, in this case, he utilized a design specification sheet published by General Electric to calculate the amount and direction of the light given produced by the train headlight. For these reasons, we find no abuse in admitting the testimony of Mortimer's experiments.

## VI

■■ Lastly, plaintiff contends that she is entitled to a new trial on every issue "because the record is so replete with error including improper legal rulings, improper admissions and exclusions of evidence, and improper instructions to the jury." "Perfect trials exist only in fiction, and we are not called upon to insure that the record is totally free of error. Rather, we have as our object to determine whether any error occurred which operated to the prejudice of the defendant or unduly affected the outcome below." (*Stromquist v. Burlington Northern, Inc.* (1983), 112 Ill. App. 3d 37, 45.) Although plaintiff contends that a new trial is warranted when a case is tried on an erroneous or mistaken theory of law (*Tankersley v. Peabody Coal Co.* (1964), 31 Ill. 2d 496, 505), any error attributed to the trial court's ruling that the pamphlet submitted by defendants served as the applicable legal standard was limited to the issue of the adequacy of the warning signals. Therefore, a new trial is warranted on the

sole issue of whether the warning devices at the Lake Shore Drive crossing should have been upgraded.

Accordingly, we affirm in part, reverse in part, and remand this cause to the trial court for further proceedings in conformance with this opinion.

Affirmed in part; reversed in part and remanded.

INGLIS, P.J., and UNVERZAGT, J., concur.