NOTICE

Decision filed 06/03/14. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2014 IL App (5th) 120464

NO. 5-12-0464

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL PORTER, as Special Administrator of the Estates of Tina Porter, Deceased, and Allaysa Porter, Deceased, | ) ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-L-17 |
| ILLINOIS CENTRAL RAILROAD COMPANY, | ) ) ) ) | Honorable Vincent J. Lopinot, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court, with opinion.

Justice Spomer concurred in the judgment and opinion.

Justice Goldenhersh dissented, with opinion.

**OPINION**

¶ 1    This is a wrongful death action brought against the Illinois Central Railroad Company (Illinois Central) by Michael Porter, as special administrator of the estates of Tina Porter, deceased, and Allaysa Porter, deceased. The decedents died as a result of a collision between the motor vehicle in which they were traveling and an Illinois Central freight train on November 20, 2006, at a crossing in the Village of Marissa (the Village).

¶ 2    At the time of the collision, the railroad crossing was equipped only with luminous

1

flashing light signals. The plaintiff alleges that the defendant was negligent in failing to equip the railroad crossing with automatic gates. The defendant responds that, because the flashing light signals had been installed pursuant to the approval and order of the Illinois Commerce Commission, statute dictates that they must be deemed adequate and appropriate and the railroad cannot be found negligent for having failed to install gates.

¶ 3    The case comes before us pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010). The circuit court certified the following two questions for our review:

"1.    Did the Illinois Central Railroad have a duty to use reasonable care to install automatic gates at the South Main Street crossing in Marissa, Illinois (AAR/DOT #296 124L) prior to November 20, 2006?

2.    Under 625 ILCS 5/18c-7401(3), are luminous flashing light signals installed at the South Main Street crossing in Marissa, Illinois (AAR/DOT #296 124L), which had previously been approved by the Illinois Commerce Commission on July 10, 1962 and thus 'shall be deemed adequate and appropriate' still 'deemed adequate and appropriate' after the August 15, 2005 letter from Michael Stead, Rail Safety Program Administrator, which stated that the 'existing conditions meet the Commission's minimum requirements for the installation of automatic gates,' even though the Illinois Commerce Commission had not yet ordered the installation of automatic gates?"

¶ 4    We will address these questions in reverse order, answering the second question first. Because a question certified by the circuit court to this court pursuant to Supreme Court Rule 308 must involve only a question of law, our review is *de novo*. *Tri-Power*

2

*Resources, Inc. v. City of Carlyle*, 2012 IL App (5th) 110075, ¶ 9.

¶ 5    Under subchapter 7 of the Illinois Commercial Transportation Law (the Act) (625 ILCS 5/18c-7101 *et seq.* (West 2008)), the Illinois Commerce Commission (the Commission) has exclusive jurisdiction over all rail carrier operations in the state. Pursuant to that jurisdiction, the Commission has exclusive power to set safety requirements for railway track, facilities, and equipment. 625 ILCS 5/18c-7401 (West 2008). Section 18c-7401(3) provides as follows:

> "The Commission shall have power, upon its own motion, or upon complaint, and after having made proper investigation, to require the installation of adequate and appropriate luminous reflective warning signs, luminous flashing signals, crossing gates illuminated at night, or other protective devices in order to promote and safeguard the health and safety of the public. *Luminous flashing signal or crossing gate devices installed at grade crossings, which have been approved by the Commission, shall be deemed adequate and appropriate.*" (Emphasis added.) 625 ILCS 5/18c-7401(3) (West 2008).

¶ 6    Our supreme court has definitively held that this statutory section establishes that, once the Commission has investigated a crossing and has approved the installation of a luminous flashing signal, then the installation of that device shall be deemed adequate and appropriate and a conclusive legal presumption is created which prevents a plaintiff from arguing that the railroad should have installed other warning devices. See *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 121 (1995); *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 342 (2003).

3

¶ 7    On July 10, 1962, pursuant to power vested in it by section 18c-7401(3), the Commission had entered an order approving the presence of only luminous flashing light signals at the railroad crossing in question. The plaintiff does not dispute that the Commission made the requisite investigation and gave its approval pursuant to section 18c-7401(3) in 1962. Furthermore, it is undisputed that the railroad crossing in question was equipped with luminous flashing light signals and that the signals were working properly at the time of the collision. Nevertheless, the plaintiff argues that the defendant had a duty to use reasonable care to install automatic gates at the crossing in addition to the luminous flashing light signals and that it breached this duty, resulting in the deaths of the decedents.

¶ 8    The plaintiff premises his argument on the fact that, prior to the collision, at the request of the citizens of the Village, the Commission had investigated the crossing and determined that it did meet the minimum requirements for adding automatic gates. While the Commission had not taken formal action on this determination at the time of the collision, it had made its determination known by way of a letter from Michael Stead, Rail Safety Program Administrator, to a local congressman dated August 15, 2005. The letter indicated that the proposed improvements were scheduled to be installed in fiscal year 2010 and that the Commission would contact the Village and the defendant railroad as fiscal year 2010 approached. The defendant railroad received a copy of this letter. In the meantime, the flashing light signals installed pursuant to the 1962 approval and order of the Commission would remain.

¶ 9    The accident occurred on November 20, 2006. Immediately thereafter, the

Commission, through Michael Stead, its Rail Safety Program Administrator, notified the local congressman that it was working with the Village and the defendant railroad to expedite a project to install automatic gates at the crossing. In that letter, the Commission, through Stead, advised that it anticipated that:

> "an agreement for the work will be executed expeditiously so that an Order, recommending the proposed safety improvements, can be submitted to the Commission early in 2007. Following Commission approval of the proposed changes, the railroad will have 12 months within which to complete the work."

According to Stead, the railroad had no authority to install the automatic gates without an order of the Commission. Such an order was entered by the Commission on August 29, 2007.

¶ 10    The plaintiff argues that Stead's letter of August 15, 2005, stating that the crossing met the minimum requirements for installation of automatic gates, somehow revoked the Commission's 1962 order approving the installation of luminous flashing light signals at the crossing and, because they were no longer "approved," they could no longer be deemed "adequate and appropriate." The plaintiff argues that Stead's letter of August 15, 2005, indicates that the Commission had "approved" the installation of automatic gates at the crossing and the presumption of adequacy and appropriateness no longer applied to the luminous flashing lights. We reject the plaintiff's argument.

¶ 11    The parties argue at length in their briefs about whether Commission "approval" of protective devices requires an "order" of the Commission. The plaintiff argues that Commission approval and an order are two different things and that, despite the absence

of an "order" requiring the installation of automatic gates at the crossing, the Commission had "approved" the installation of automatic gates as indicated by Stead's letter of August 15, 2005. We understand the plaintiff's argument to be that "approval" by the Commission of the automatic gates somehow revoked the Commission's "approval" of the already installed luminous flashing light signals, thereby removing the statutory presumption that the signals were "adequate and appropriate."

¶ 12 We find no need to discuss the difference between a Commission "order" and Commission "approval." The statutory language establishing the presumption speaks in terms of protective devices "installed" at grade crossings, which have been approved by the Commission. It seems to us that the key word here is "installed." Once installed pursuant to Commission approval, the protective devices retain the presumption of adequacy and appropriateness until they are replaced. They do not lose the presumption simply because a future change has been approved or ordered by the Commission. Our interpretation of the statute is consistent with the statutory scheme and with existing case law.

¶ 13 In *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107 (1995), our supreme court discussed the language of section 18c-7401(3) of the Act which provides that installed and approved luminous flashing signal devices at grade crossings shall be deemed adequate and appropriate. The court stated:

"We interpret the relevant language of section 18c-7401(3) as providing that once the Commission has investigated a crossing and has approved the installation of a luminous flashing signal or crossing gate device, then the *installation* of that

6

device shall be deemed adequate and appropriate. A conclusive legal presumption is created which prevents plaintiffs from arguing that the railroad should have installed other warning devices." (Emphasis added.) *Espinoza*, 165 Ill. 2d at 121. Our supreme court again so held in *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 341-45 (2003). Furthermore, the unqualified language of section 18c-7401(3) manifests an intent to allow railroads to rely on Commission determinations with respect to the adequacy and appropriateness of crossing protective devices regardless of changed circumstances or the passage of time. *Danner v. Norfolk & Western Ry. Co.*, 271 Ill. App. 3d 598, 603 (1995). Thus, the fact that circumstances had changed at the crossing such that it now met the minimum requirements for the installation of automatic gates did not deprive the defendant railroad of the conclusive legal presumption that the approved and installed luminous flashing light signals were adequate and appropriate until they were replaced. To hold otherwise would subject the railroad to liability for the period of time between the determination that a change was warranted and the actual installation of the new protective devices. This is certainly not the intent of the statute. Section 18c-7401 is "clearly intended to foreclose litigation over the adequacy of approved warning devices." *Danner*, 271 Ill. App. 3d at 602.

¶ 14 Accordingly, we answer the first-addressed certified question in the affirmative. Under section 18c-7401(3) of the Act the luminous flashing light signals installed at the subject crossing are still deemed "adequate and appropriate" even after the August 15, 2005, letter from Stead which stated that the crossing now met the minimum requirements for the installation of automatic gates and will remain so until replaced

7

pursuant to Commission approval.

¶ 15 We turn now to the other certified question: "Did the Illinois Central Railroad have a duty to use reasonable care to install automatic gates at the South Main Street crossing in Marissa, Illinois (AAR/DOT #296 124L) prior to November 20, 2006?"

¶ 16 Taking the question as stated, the answer is clearly no. Because the flashing luminous light signals had been installed pursuant to the approval and order of the Commission, they must be deemed adequate and appropriate, and not only did the defendant railroad have no duty to install automatic gates at the crossing, it was expressly prohibited from doing so by the Act. *Hunter v. Chicago & North Western Transportation Co.*, 200 Ill. App. 3d 458, 465-66 (1990) (once the Commission has ordered the installation of a particular kind of warning device, its decision is conclusive, and the railroad is prohibited from installing any other).

¶ 17 Further, if by the certified question the circuit court meant to ask whether the defendant railroad had a duty to *petition* the Commission for permission to install automatic gates at the crossing, the answer remains no. Under section 18c-7401(3) of the Act, there is no duty to petition the Commission for additional warning devices once warning lights have been installed pursuant to approval of the Commission. *Danner v. Norfolk & Western Ry. Co.*, 271 Ill. App. 3d 598, 602 (1995).

¶ 18 In *Danner*, the following question was certified to the appellate court:

" 'In light of the provision of 625 ILCS 5/18c-7401(3) that "luminous flashing signal or crossing gate devices installed at grade crossings which have been approved by the Commission, shall be deemed adequate and appropriate", does a

8

railroad have a common law or other duty to petition the [Commission] to authorize an upgrade of the protection by installation of additional safety devices at a crossing protected by flashing signals ordered and approved by the [Commission], when the railroad is aware or should be aware that additional safety devices are warranted?' " *Danner*, 271 Ill. App. 3d at 600.

The court answered the question as follows: "The answer to the certified question is no, there is no duty." *Danner*, 271 Ill. App. 3d at 604.

¶ 19    We answer the certified question before us the same way: the railroad had no duty to install, or to petition for permission to install, automatic gates at the crossing in question.

¶ 20    In conclusion, the defendant railroad is entitled to the conclusive legal presumption that the luminous flashing light signals installed at the crossing in question were adequate and appropriate at the time of the accident. Further, the defendant railroad had no duty to install at the crossing automatic gates or to petition the Commission for permission to do so.

¶ 21    Certified questions answered; cause remanded for further proceedings.


¶ 22    JUSTICE GOLDENHERSH, dissenting:

¶ 23    I respectfully dissent. The following two questions were certified for appeal:

Certified Question No. 1: "Did the Illinois Central Railroad have a duty to use reasonable care to install automatic gates at the South Main Street crossing in Marissa, Illinois (AAR/DOT #296 124L) prior to November 20, 2006?"

9

Certified Question No. 2: "Under 625 ILCS 5/18c-7401(3), are luminous flashing light signals installed at the South Main Street crossing in Marissa, Illinois (AAR/DOT #296 124L), which had previously been approved by the Illinois Commerce Commission on July 10, 1962 and thus 'shall be deemed adequate and appropriate' still 'deemed adequate and appropriate' after the August 15, 2005 letter from Michael Stead, Rail Safety Program Administrator, which stated that the 'existing conditions meet the Commission's minimum requirements for the installation of automatic gates,' even though the Illinois Commerce Commission had not yet ordered the installation of automatic gates?"

¶ 24    I would answer the first question in the affirmative and the second question in the negative.

¶ 25    The Illinois Commerce Commission has two bureaus–the Public Utilities Bureau and the Transportation Bureau.  The formulation of the certified questions presented on appeal rests largely on correspondence and deposition testimony of Michael Stead, head of the Rail Safety Section in the Transportation Bureau.  Stead testified that he reports to the head of the Transportation Bureau, who reports to the executive director.  The executive director, "in turn, reports to the Commission itself."  Stead described the Hearings and Orders Section that consists of three administrative law judges that holds hearings and issues directives on petitions:

"Q.  [Attorney for defendant:]  And what is their function as it would relate to the petition process?

A. Once a petition is filed, then an administrative hearing is scheduled, and when those hearings are held, the administrative law judge, for lack of a better term, runs those hearings much like a judge in a court of law would do.

Q. Okay. And then after they have run that hearing, what would be the product of that hearing?

A. The product of those hearings normally is an order that is submitted to the Commission for its approval, and within those–that order is the language that directs the parties accordingly depending on the contents of the petition."

¶ 26    In February of 2000, the mayor of Marissa submitted a project application to the Commission which sought an upgrade over the existing flashing light signals. Due to the project application, the Commission performed a database review of the crossing and, in April 2005, placed the crossing on a five-year project list for fiscal year 2007 through fiscal year 2011.

¶ 27    In his deposition, Stead reviewed a set of proposed grade-crossing protection fund projects for local roads and streets–one for fiscal years 2006 through 2010 and another for fiscal years 2007 through 2011. The plan for fiscal years "FY 2007-2011 Plan" was issued by the Illinois Commerce Commission in April 2006. The South Main Street crossing in Marissa was listed in "Appendix 2 FY 2008-2011 Projects by County" with a cost of $265,000. The plan noted: "Projects programmed for submittal to the Commission in FY2008-2011 are listed in Appendix 2. For those years, it is anticipated the Commission will consider projects requiring commitment from the Grade Crossing

11

Protection Fund totaling over $133 million, affecting more than 219 crossings in over 69 counties." At the bottom of each page of appendix 2, including the page listing the Marissa crossing, a footnote stated: "Note: Total Est. Project Costs are shown, since Commission approval has not been granted for these projects." Appendix 3 listed the "Active Projects" with specific locations and cost information.

¶ 28 Stead described the document:

"A. *** So we have a tabular summary for the one-year plan and also for the five-year plan. Ultimately we have a list of all of the proposed crossing improvement projects planned for the next five years.

Q. [Attorney for plaintiff:] And you say, 'proposed.' What do you mean by proposed?

A. These are projects that we propose.

Q. When you say 'we' who are you–

A. When I say, 'we,' I'm referring to Rail Safety Section staff. This is a list of projects that we propose, we submit to the Commission for its approval. Pending approval, pending the Commission's approval of this entire five-year plan document, this list represents the projects for which the Commission has committed assistance from the Grade Crossing Protection Fund for completion of the projects, and proposed also means projects we feel comfortable–we, again, staff from–Rail Safety Section staff believe will eventually be completed, actually ordered in the next five years and eventually completed thereafter. There are

12

some cases where these projects run into delays and have to be pushed back. That's why we continue to consider it proposed projects rather than actual projects.

Q. Okay. So all of those projects that are listed in–as part of Exhibit 5 are not projects that have actually, at the point that document is prepared, been ordered by the Commission?

A. That's correct.

Q. The ones that had actually been ordered by the Commission, are they identified separately in that list by appendix or otherwise?

A. Yes. Appendix 3 of the five-year plan includes a list that are described as active projects, and the definition of active projects are projects that have been approved through order by the Commission."

¶ 29    In June 2005, Congressman Jerry Costello sent correspondence to Peggy Snyder, the Director of Office of Government Affairs for the Commission, regarding the crossing. Costello attached a letter from Mike Parker of Marissa that contained a petition signed by over 180 citizens of the Marissa area. Apparently Frank Miles also filed an online complaint and received correspondence on June 28, 2005. This is only referred to in Stead's deposition.

¶ 30    On June 30, 2005, Stead sent correspondence to Congressman Costello. Stead wrote in response to the petitions Costello forwarded to the Commission's Office of Government Affairs. He acknowledged that the petitions reflected a concern by citizens

13

of Marissa that automatic gates were necessary at the South Main and Finger Hill Road crossings, writing:

"A representative of this office will be assigned to investigate your constituents' concerns. If existing conditions meet the Commission's minimum requirements for adding automatic gates, we will work with the Village and the railroad to implement the safety improvements as soon as possible."

¶ 31 On August 15, 2005, Stead sent Congressman Costello a "follow-up" letter, which stated:

"*A representative of this office recently inspected the subject crossings and determined that existing conditions meet the Commission's minimum requirements for the installation of automatic gates*. Assistance from the Grade Crossing Protection Fund (GCPF) has been programmed to help pay for the installation of new automatic flashing light signals and short-arm gates at the subject crossings during state fiscal year 2010 (July 1, 2009 - June 30, 2010). We will contact the Village and [defendant] to discuss the details of these proposed improvements as FY 2010 nears.

For the installation of automatic flashing light signals and gates we typically recommend to the Commission that the GCPF be used to pay 85% of the installation costs at each location. The Village of Marissa would likely be responsible for 10% of the installation costs. Defendant would pay all remaining

14

installation costs, as well as all future operating and maintenance costs."
(Emphasis added.)

Stead noted that the cost to install the gates was estimated at $235,000 per crossing.

¶ 32    Stead proceeded to address the issue of funding.  He estimated the portion to be paid by Marissa at $47,000 plus all costs that might be incurred for improving the grade improvements to the road.  Stead commented that "[w]ith the proposed improvements programmed for FY 2010," Marissa would have sufficient time to budget for its share of costs, but if Marissa lacked funds it could submit a hardship application.  Stead continued:

"The large number of project requests submitted every year requires us to prioritize projects based on several criteria, including the relative safety of the existing crossing, and the volume and types of existing train and highway traffic.

After each application is prioritized based on engineering requirements, geographic location is also taken into account so that improvements throughout the state can be addressed as equitably as possible.  In this instance, since both crossings are currently equipped with automatic flashing light signals, we determined that project requests to install automatic warning devices at crossing locations equipped only with crossbuck warning signs should be given priority."

Stead forwarded copies of his correspondence to representatives of the Village of Marissa and defendant.

15

¶ 33 The fatal accident occurred on November 20, 2006. On November 22, 2006, Stead sent Congressman Costello another letter. Stead wrote:

"I previously indicated that assistance from the Grade Crossing Protection Fund (GCPF) had been included in the Illinois Commerce Commission's FY 2007-2011 Crossing Safety Improvement Program 5-Year Plan to help pay for the installation of new automatic flashing light signals and short-arm gates at the subject crossings during state fiscal year (FY) 2010 (July 1, 2009 - June 30, 2010). *However after a train/vehicle collision occurred at the South Main Street crossing on Monday November 20th, this office is working with the Village of Marissa and the CN to expedite a safety improvement project to install automatic flashing light signals and gates at both crossings as soon as possible.* Working in conjunction with the Village and the railroad we anticipate an agreement for the work will be executed expeditiously so that an Order, recommending the proposed safety improvements, can be submitted to the Commission early in 2007. Following Commission approval of the proposed safety improvements the railroad will have 12 months within which to complete the work." (Emphasis added.)

¶ 34 On August 29, 2007, the chairman of the Illinois Commerce Commission signed an order of the Commission requiring and directing defendant to proceed immediately with installation of gates at the crossings as outlined in a stipulated agreement. The order required defendant to proceed immediately and subjected defendant to fines if the installation was not completed within 12 months.

16

¶ 35    The stipulated agreement was attached to the order. The agreement provided the preliminary plans and costs estimates along with outlining the division of costs and was signed by Stead and attested by Von DeBur on April 26, 2007. On later dates, the stipulation was signed by representatives of the Village of Marissa, the Illinois Department of Transportation, and defendant.

¶ 36    On January 10, 2007, plaintiff filed suit in the circuit court of St. Clair County. Defendant filed an answer and affirmative defenses, including that the flashing signals were conclusively adequate and appropriate under the Illinois Commercial Transportation Law (625 ILCS 5/18c-7401 (West 2006)). The court granted plaintiff's motion to strike the affirmative defenses and defendant filed for supervisory order. On May 16, 2007, the Supreme Court of Illinois entered a supervisory order directing the circuit court to vacate the order striking the affirmative defenses. The circuit court entered an order vacating the previous order, denying the motion to strike affirmative defenses, and entered an order certifying the two questions for appeal.

¶ 37    Defendant contends that the applicable statutory scheme permitted its behavior. The Illinois Commercial Transportation Law provides a conclusive presumption that signal installations "approved" by the Commission are to be deemed adequate and appropriate. Plaintiff replies that the term "approved" is not synonymous with "order" or "require"–thus, the meaning of the statute is ambiguous. This reveals an underlying issue of whether the condition of a crossing is still "deemed adequate and appropriate" when a Commission investigation spurred by citizen petition determines a need for upgrade. Any attempt to address the certified questions and the underlying issues in terms of this

17

regulatory scheme leads to an inquiry as to whether the present situation was beyond the contemplation and legislative intent of the General Assembly as embodied in its statute.

¶ 38                                    History of Presumption

¶ 39   Illinois has long recognized that rail carriers have a duty to provide adequate warning devices at road crossings. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 120, 649 N.E.2d 1323, 1329 (1995); *Langston v. Chicago & North Western Ry. Co.*, 398 Ill. 248, 253, 75 N.E.2d 363, 365 (1947).  This duty stems from a responsibility of rail carriers to exercise ordinary care regarding the safety of public crossings of railway tracks. *Bales v. Pennsylvania R.R. Co.*, 347 Ill. App. 466, 474, 107 N.E.2d 179, 183 (1952).

¶ 40   Prior to enactment of section 18c-7401(3) of the Illinois Commercial Transportation Law, a rail carrier's compliance with the standards set forth by the state constituted evidence of due care.  *Paulison*, decided shortly before enactment of 18c-7401(3), exemplifies the previous approach. *Paulison v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 74 Ill. App. 3d 282, 288, 392 N.E.2d 960, 964 (1979) (citing *Merchants National Bank of Aurora v. Elgin, Joliet & Eastern Ry. Co.*, 121 Ill. App. 2d 445, 257 N.E.2d 216 (1970), *aff'd*, 49 Ill. 2d 118, 273 N.E.2d 809 (1971)).  In *Paulison*, the estate of a motorist brought a wrongful death action asserting that the rail carrier was negligent for failing to provide automatic gates at a crossing even though state standards did not require gates at the single track crossing.  Relying on *Merchants*, *Paulison* discussed the previous approach:

18

"The question then becomes whether the State standards represent the totality of defendant's duty. This question was presented to this court in *Merchants National Bank v. Elgin, Joliet, & Eastern Ry. Co.* (1970), 121 Ill. App. 2d 445, 257 N.E.2d 216, *aff'd* (1971), 49 Ill. 2d 118, 273 N.E.2d 809. In that case, the State standards were also introduced. The railroad argued that it was not negligent because the Illinois Commerce Commission had not ordered a particular warning device for that crossing. In response, this court held: '[t]he fact that a statute may provide one precaution does not relieve the railroad from adopting such others as public safety or common prudence may dictate.' (121 Ill. App. 2d 445, 456.) Clearly, the State standards are merely evidence of due care; they do not operate to relieve defendant of liability even if complied with. 'A railroad company is required to exercise ordinary prudence and care in operating its trains to prevent injury to those who travel upon a public highway crossing its tracks.' (*Bales v. Pennsylvania R.R. Co.* (1952), 347 Ill. App. 466, 474, 107 N.E.2d 179.) 'The fact that the statute may provide one precaution does not relieve the company from adopting such others as public safety or common prudence may dictate.' *Wagner v. Toledo, Peoria & Western R.R.* (1933), 352 Ill. 85, 91, 185 N.E. 236.

These cases indicate that there may have been a duty upon the defendant railroad to install automatic gates notwithstanding the fact that they were not required under the State standards." *Paulison*, 74 Ill. App. 3d at 288, 392 N.E.2d at 964.

19

¶ 41   No longer are the state standards merely evidence of due care. Although railroads still have a duty to provide adequate warning devices, the Illinois Commercial Transportation Law has created a conclusive presumption that the installation of devices as "approved by the Commission" is adequate and appropriate. 625 ILCS 5/18c-7401 (West 2006).

¶ 42   The General Assembly declared that the accelerating growth of the transportation industry and attendant regulation "necessitates the streamlining of regulatory procedures to allow for prompt action to protect the interests of the people of the State of Illinois." 625 ILCS 5/18c-1102(b) (West 2006). The Commission has plenary and exclusive jurisdiction over the safety devices at crossings. *McClaughry v. Village of Antioch*, 296 Ill. App. 3d 636, 639, 695 N.E.2d 492, 496 (1998). Its role in overseeing safety devices at crossings and the standards for such devices is in accord with federal regulation and the Manual on Uniform Traffic Control Devices. 23 C.F.R. 655.601 (2012); see *Brennan v. Wisconsin Central Ltd.*, 227 Ill. App. 3d 1070, 1079, 591 N.E.2d 494, 501 (1992).

¶ 43   Section 18c-7401 of the Illinois Commercial Transportation Law governs safety requirements for rail carriers regarding tracks, facilities, and equipment. The section is copious and addresses numerous aspects of the maintenance and installation of tracks at road crossings, including obligations of rail carriers to maintain flush crossings and clear shrubbery for visibility. Paragraph (3) gives the Commission the authority to determine the number, type, and location of protective devices at crossings including signs, signals, and gates. 625 ILCS 5/18c-7401(3) (West 2006).

¶ 44    In 1982, the General Assembly adopted an amendment to section 18c-7401(3) that forms the focus of this dispute. Pub. Act 82-763 (eff. Jan. 1, 1983) (amending sections 57 and 58 of the Illinois Public Utilities Act, which was the precursor of the Illinois Commercial Transportation Law). This amendment created a statutory presumption:

> "The Commission shall have power, upon its own motion, or upon complaint, and after having made proper investigation, to require the installation of adequate and appropriate luminous reflective warning signs, luminous flashing signals, crossing gates illuminated at night, or other protective devices in order to promote and safeguard the health and safety of the public. *Luminous flashing signal or crossing gate devices installed at grade crossings, which have been approved by the Commission, shall be deemed adequate and appropriate.*" 625 ILCS 5/18c-7401(3) (West 2006).

¶ 45                      Statutory Scheme and Defendant's Case

¶ 46    Plaintiff argues that the situation at hand was beyond the contemplation and intent of the legislature expressed in section 18c-7401. Defendant argues section 18c-7401 is globally comprehensive and contends that the flashing signals were adequate and appropriate as they had been installed pursuant to order of the Commission. Defendant argues that the exclusive jurisdiction and regulatory authority of the Commission over safety devices is signified by the repeated use of the terms "order" and "require" in section 18c-7401. For example, section 18c-7401 provides that "[t]he Commission shall also have power by its order to require *** improvement of any crossing" and may apportion the cost "[b]y its original order or supplemental orders." 625 ILCS 5/18c-

21

7401(3) (West 2006). Moreover, the sentence establishing a conclusive presumption is preceded by a sentence authorizing the Commission to "require" the installation of adequate and appropriate luminous devices. Essentially, defendant asserts that imbuing "approval" with a distinct meaning from "order" and "require" would divorce the term from the context of the statutory scheme, and particularly the exclusive authority of the Commission to set requirements through orders set forth in section 18c-7401.

¶ 47                          Case Law and Plaintiff's Case

¶ 48    Pointing to the same passages of section 18c-7401 relied on by defendant, plaintiff asserts that throughout section 18c-7401 the word "order" is used in conjunction with the Commission's power to "require" action after a hearing, but that the use of the term "approved" signifies something other than a requirement. Plaintiff calls approval "something less than an order pursuant to a hearing." Indeed, section 18c-7401 does not limit the Commission's authority to the power to "require," but also uses the term "permission." "No public road, highway, or street shall hereafter be constructed across the track of any rail carrier *** without having first secured the permission of the Commission ***." 625 ILCS 5/18c-7401(3) (West 2006). "The Commission shall have the right to refuse its permission or to grant it upon such terms and conditions as it may prescribe." 625 ILCS 5/18c-7401(3) (West 2006). Plaintiff argues the instant situation was not contemplated by the legislature when enacting section 18c-7401–a rule from the Commission in the process of modification.

¶ 49    Contrary to the position taken by defendant, the term "approved" has been interpreted as not being synonymous with "order" in section 18c-7401. *Chandler v.*

22

*Illinois Central R.R. Co.*, 207 Ill. 2d 331, 342-43, 798 N.E.2d 724, 730 (2003); *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 121, 649 N.E.2d 1323, 1329 (1995).

¶ 50    In *Espinoza*, flashing light signals had been installed in 1965 and, in 1981, Commission staff had inspected the crossing and determined that gates were not necessary.  Section 18c-7401 of the Illinois Commercial Transportation Law did not become effective until 1986.  The plaintiffs argued that in order for section 18c-7401 to apply, the approval must have taken place after the effective date the statutory provision came into effect and, as such, "the Commission has not yet made an investigation and determination that the warning devices installed *** are adequate and appropriate." *Espinoza*, 165 Ill. 2d at 122, 649 N.E.2d at 1330.  *Espinoza* framed the issue in terms of whether the defendant "owed a duty to provide *additional* warning devices, such as crossing gates."  (Emphasis in original.)   *Espinoza*, 165 Ill. 2d at 121, 649 N.E.2d at 1329.  *Espinoza* reasoned that the conclusive presumption in favor of the railroad was justified because the "railroad can install no other signal, by law," once the Commission orders a particular kind of signal.  (Internal quotation marks omitted.)  *Espinoza*, 165 Ill. 2d at 122, 649 N.E.2d at 1330.

¶ 51    *Espinoza* proceeded to reject plaintiffs' contention that approval must be in the form of an order entered after the effective date of section 18c-7401 of January 1, 1983. *Espinoza*'s conclusion focused on the role of investigation, not the procedural process of the Commission entering an order.  *Espinoza* found:

"The Transportation Law provides that certain devices approved by the Commission shall be deemed adequate and appropriate.  By its plain language it

23

applies to any Commission investigation and approval.  It does not restrict its application to investigations and approvals that occurred after a certain date, as plaintiffs argue." *Espinoza*, 165 Ill. 2d at 122, 649 N.E.2d at 1330.

¶ 52    *Espinoza* turned to the legislative history for support of a lack of a time frame for investigation.  A railroad could take the "extra precaution of putting in a gate." (Internal quotation marks omitted.)  *Espinoza*, 165 Ill. 2d at 123, 649 N.E.2d at 1330.  After reviewing this history, *Espinoza* concluded that the legislature intended that Commission investigations and approvals that occurred prior to the enactment of section 18c-7401 were sufficient to invoke the presumption.  *Espinoza*, 165 Ill. 2d at 123, 649 N.E.2d at 1330.

¶ 53    The approval in *Espinoza* derived from the 1981 investigation and approval, not from the 1965 order.  Plaintiff points to language of investigation in *Espinoza*:

"We interpret the relevant language of section 18c-7401(3) as providing that once the Commission has investigated a crossing and has approved the installation of a *** crossing gate device, then the installation of that device shall be deemed adequate and appropriate." *Espinoza*, 165 Ill. 2d at 121, 649 N.E.2d at 1329-30.

¶ 54    *Espinoza*'s conclusion was that the flashing lights met approval was based on the most recent investigation of the Commission.  *Espinoza* concluded:

"The record in this case establishes that the Commission has made the requisite investigation and approval pursuant to the Transportation Law.  In 1965, the Commission entered an order that cantilever-mounted flashing light signals be installed at the 22nd Street crossing.  The certified records of the Commission also

24

show that, in 1981, a member of the Commission staff specifically inspected the 22nd Street crossing to determine whether crossing gates were necessary. Bernard Morris, chief railroad engineer for the Commission, stated that, as a result of the 1981 inspection, he determined that crossing gates were not necessary. According to Morris, the warning signals at the 22nd Street crossing were determined by the Commission to be adequate and appropriate. He therefore concluded that the warning devices existent at the crossing remained adequate and appropriate at the time of the accident since the Commission order from 1965 was still in effect." *Espinoza*, 165 Ill. 2d at 123-24, 649 N.E.2d at 1330-31.

¶ 55 *Chandler* involved a crossing in Tilden that had been equipped according to a 1962 order entered on the petition of Illinois Central Railroad Company. Before specifically addressing the arguments made by the plaintiff, *Chandler* discussed *Espinoza*. *Chandler* interpreted *Espinoza* as finding approval derives from the Commission investigation. *Chandler* described *Espinoza*:

"The record in the case established that the Commission had made the requisite investigation and approval pursuant to the Transportation Law. *Espinoza*, 165 Ill. 2d at 123. In 1965, the Commission had entered an order that flashing light signals be installed at the crossing, and, in 1981, Commission staff had inspected the crossing and determined that crossing gates were not necessary. *Espinoza*, 165 Ill. 2d at 123-24." *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 342-43, 798 N.E.2d 724, 730 (2003).

*Chandler* found that the record led to the conclusion "that in 1962 the Commission duly *investigated* the crossing and the adequacy of the warning devices." (Emphasis added.) *Chandler*, 207 Ill. 2d at 343, 798 N.E.2d at 730. *Chandler* did not rest alone on the 1962 order, but looked to the supporting investigation. In support of the 1962 petition, Illinois Central had submitted documentary evidence, including blueprints, and the Commission entertained testimony.

¶ 56 After commenting on the investigation supporting the Commission approval, *Chandler* proceeded to discount the arguments made by the plaintiff. The plaintiff asserted that the conclusive presumption applies only where the Commission approves the installation of devices upon its own motion and only applies when the Commission requires warning devices. *Chandler* rejected these arguments, again looking to the connection between investigation and approval:

"Plaintiff also follows the reasoning of the appellate court in arguing that the conclusive legal presumption only applies where the Commission, *upon its own motion or upon complaint*, approves the installation of the warning devices (see 333 Ill. App. 3d at 470). Plaintiff notes that Illinois Central initiated the proceedings at issue as opposed to the Commission or a private citizen. We reject plaintiff's argument. First, plaintiff assumes that the conclusive legal presumption cannot apply if a railroad moves for a change to a railroad crossing. Nothing in section 18c-7401(3) so intimates. Moreover, there is no principled reason to distinguish between instances where the Commission approves the warning devices following investigation, whether the proceedings are initiated by the

26

Commission, the railroad, a municipality or a private individual. Second, as noted in *Espinoza*, 165 Ill. 2d at 122, the conclusive legal presumption applies to 'any Commission investigation and approval.' It is not limited to instances where the Commission requires the installation of warning devices at a crossing, as opposed to instances where the Commission approves existent warning devices. Again, there is no principled reason for a distinction. The Commission undertakes the same investigation and is motivated by the same safety concerns whether it enters an order in a proceeding initiated by a railroad or by another entity, and whether it approves existent warning devices or warning devices which are to be placed at the crossing at a later date. In this regard we note that section 18c-7401(3) provides that '[n]o railroad may change or modify the warning device system at a railroad-highway grade crossing, including warning systems interconnected with highway traffic control signals, without having first received the approval of the Commission.' 625 ILCS 5/18c-7401(3) (West 1996). Illinois Central modified the warning device system at the Center Street crossing upon approval of the Commission." (Emphasis in original.) *Chandler*, 207 Ill. 2d at 344-45, 798 N.E.2d at 731.

¶ 57 Both *Espinoza* and *Chandler* indicate that the policy behind granting protection to railroads is justified by the fact that the Commission had investigated the safety devices. Neither of these precedents involved the modification of approval. Thus, the question again becomes whether the situation at hand was contemplated by the legislature when it created the statutory protection for the railroad.

27

¶ 58   I conclude that the situation at hand was *not* contemplated by the legislature.  The change to this particular rail crossing had been investigated and approved by the person and divisions charged with determining the merits of such a modification.  It was on the waiting list for a formal order from the Commission; the only effect of such order would be allocation of funding for the change in the crossing, resulting in defendant sharing the cost of modification with the state and municipality rather than bearing the entire financial burden itself.  The collision in this case occurred 15 months after the Commission's investigation and determinations.  The determination had already been made that the crossing was unsafe and the need for upgrade already proven.  The record suggests a funding concern, not a contest over whether the conditions were safe or "approved."  Defendant's strategy in this contest was to lay low and silent.  There was no other impediment to the changes or reason to assume that the crossing did not fit in the category of those "approved."

¶ 59   Defendant contends that failure to afford statutory protection would create a duty for it to file a petition for modification.  This is without merit.  Defendant's reaction upon being informed of the investigation was not merely a failure to file a petition for modification–defendant reacted with silence.  Even after the investigation revealed the need for installation of automatic gates, defendant was decidedly uninvolved.  Most importantly, defendant's assertion underlies how the situation at hand was not contemplated by the legislature.  Certainly the legislature did not intend to encourage a railroad such as defendant to remain detached, indeed silent, when confronted with complaints by the mayor, congressman, and citizenry of a village and an investigation

28

concluding that there was need for change. Likewise, the majority's citation of *Danner v. Norfolk & Western Ry. Co.*, 271 Ill. App. 3d 598 (1995), is not on point. *Danner*, like *Espinoza* and *Chandler*, had no occasion to address the situation in the instant case, a rule in the process of modification.

¶ 60 The statute in question, in contrast to the instant facts on record, deals with a completed Commission process and the resulting presumption. The parties to this litigation have not presented, and our research has not revealed, any indication that the legislature considered a rule in the process of change, already approved on the merits, and merely awaiting the formalities leading to implementation of funding. The legislative intent, evidenced by the statute's language, contemplated the consequences of a formally completed process, not one in process.

¶ 61 Likewise, our supreme court's decisions in *Espinoza* and *Chandler* examined and clarified the consequences of the completed process dealt with in the statute. *Espinoza* dealt with the questions of effective date and the extent of safety machinery (gates not needed). In *Chandler*, the court examined the Commission's record supporting approval of existing warning devices. Neither *Espinoza* nor *Chandler* had occasion to examine the consequences and implications of the present scenario: changes investigated, approved, and recommended by the appropriate Commission personnel and merely awaiting formal order and funding. *After* a formal order, funding, and completion of the project, the statutory presumptions in *Espinoza* and *Chandler* could apply.

¶ 62 I now turn to the certified questions from the circuit court, but will consider them in reverse order.

¶ 63    Certified question No. 2 deals with the effect of the existing order for this crossing in light of the investigation, determination, and recommendation of the appropriate Commission personnel.  In light of the discussion above, I would answer this question in the negative.  Answering it in the affirmative would contradict what the Commission personnel actually determined.

¶ 64    In light of the answer to question No. 2, I would answer question No. 1 in the affirmative.  Both *Espinoza* and *Chandler* recognize that a railroad has a duty to provide adequate devices (*Espinoza*, 165 Ill. 2d at 120, 649 N.E.2d at 1329; *Chandler* 207 Ill. 2d at 341, 798 N.E.2d at 729).  Nothing in this record indicates that anything but funding was at issue after the findings by the Commission personnel outlined above.  Further, nothing in this record suggests any impediment to a stipulation to that effect, and the shield of the statutory presumption does not apply in this case (see question No. 2).

¶ 65    Accordingly, I respectfully dissent.

2014 IL App (5th) 120464

NO. 5-12-0464

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

MICHAEL PORTER, as Special Administrator    )    Appeal from the
of the Estates of Tina Porter, Deceased,       )    Circuit Court of
and Allaysa Porter, Deceased,             )    St. Clair County.
                                          )
      Plaintiff-Appellee,               )
                                          )
v.                                       )    No. 07-L-17
                                          )
ILLINOIS CENTRAL RAILROAD          )
COMPANY,                          )    Honorable
                                          )    Vincent J. Lopinot,
      Defendant-Appellant.           )    Judge, presiding.

_____

**Opinion Filed:**        **June 3, 2014**

_____

**Justices:**        Honorable Thomas M. Welch, P.J.

                    Honorable Stephen L. Spomer, J.,
                    Concurring
                    Honorable Richard P. Goldenhersh, J.,
                    Dissenting

_____

**Attorneys**      Thomas E. Jones, Harlan A. Harla, Thompson Coburn LLP, 525
**for**           West Main Street, P.O. Box 750, Belleville, IL 62222-0750
**Appellant**

_____

**Attorneys**      Thomas Q. Keefe, Jr., Samantha S. Unsell, Keefe & Keefe, P.C.,
**for**           #6 Executive Woods Court, Belleville, IL 62226
**Appellee**

_____